1  Squire, Sanders & Dempsey L.L.P.
   Ethan A. Miller (State Bar # 155965)
2  David A. Gabianelli (State Bar # 158170)
   Ethan H. Seibert (State Bar # 232262)
3  Michelle M. Full (State Bar # 240973)
   275 Battery Street, Suite 2600
4  San Francisco, California 94111
   Telephone:   +1.415.954.0200
5  Facsimile:   +1.415.393.9887
   E-mail:   eamiller@ssd.com
6  E-mail:   dgabianelli@ssd.com
   E-mail:   eseibert@ssd.com
7  E-mail:   mfull@ssd.com

8  Attorneys for Defendants and Counter-Claimant
   ZURICH AMERICAN INSURANCE COMPANY
9  and STEADFAST INSURANCE COMPANY

10                 UNITED STATES DISTRICT COURT

11               NORTHERN DISTRICT OF CALIFORNIA

12                   (SAN FRANCISCO DIVISION)

13  UNITED STATES OF AMERICA,              Case No. CV08-5005-MMC

14                 Plaintiff,              **STEADFAST INSURANCE COMPANY'S
                                           NOTICE OF MOTION AND MOTION
15       vs.                               FOR PARTIAL SUMMARY JUDGMENT;
                                           MEMORANDUM IN SUPPORT**
16  ZURICH INSURANCE COMPANY,
    ZURICH AMERICAN INSURANCE             Date:       December 3, 2010
17  COMPANY and STEADFAST                 Time:       9:00 A.M.
    INSURANCE COMPANY,                    Dept.:      Courtroom 7, 19th Floor
18                                         Judge:      Judge Maxine M. Chesney
                   Defendants.
19                                         Trial Date: February 28, 2011

20  STEADFAST INSURANCE COMPANY,

21                 Counter-claimant,

22       vs.

23  THE PRESIDIO TRUST, a Wholly-Owned
    Corporation of the UNITED STATES OF
24  AMERICA,

25                 Counter-defendant.

26

27

28

SQUIRE, SANDERS &
DEMPSEY L.L.P.
275 Battery Street, Suite 2600
San Francisco, California 94111

STEADFAST'S NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT;
MEMORANDUM IN SUPPORT - Case No. CV08-5005-MMC

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION AND STATEMENT OF ISSUES TO BE DECIDED........................ 2

II.  STATEMENT OF FACTS ..................................................................................... 9

  A.   The Trust's Knowledge And Discovery Of The Lead "Pollution Event" At Mountain Lake ................................................................................. 9

  B.   Cleanup Of Mountain Lake.................................................................. 12

  C.   The Insurance Policies ......................................................................... 12

    1.   The REEL Policy ........................................................................ 12

    2.   The RSL Policy .......................................................................... 14

  D.   Steadfast Has Acknowledged "Coverage" under the RSL Policy ........................ 17

III. DISCUSSION ................................................................................................... 17

  A.   Legal Standards Applicable to Contract Interpretation in California .................. 17

  B.   The Presidio Trust's Claims as to Mountain Lake Fail As A Matter Of Law ...... 18

    1.   No coverage is available under the REEL Policy for Mountain Lake...... 18

      a.   REEL Coverage Part A does not apply because The Presidio Trust discovered the contamination before the policy period....... 19

      b.   REEL Coverage Part B does not apply because the Mountain Lake claim was first made before the policy period ................................................................................ 20

      c.   REEL Exclusion A—and Endorsement 3—bars coverage for remediation of the known contamination at Mountain Lake under both Coverage Parts A and B .................................... 21

    2.   The Contamination at Mountain Lake is covered under the RSL Policy ......................................................................................... 22

IV.  CONCLUSION.................................................................................................. 25

SQUIRE, SANDERS &
DEMPSEY L.L.P.
555 South Flower Street, 31st Floor
Los Angeles, California 90071

# TABLE OF AUTHORITIES

Page

## FEDERAL CASES

*Northrop Grumman Corp. v. Factory Mut. Ins. Co.*,
563 F.3d 777 (9th Cir. 2009) ................................................................ 17, 18

## STATE CASES

*AIU Ins. Co. v. Superior Court*,
51 Cal. 3d 807 (1990) .................................................................................. 18

*Am. Alternative Ins. Corp. v. Superior Court*,
135 Cal. App. 4th 1239 (2006) ................................................................... 18

*Bank of the W. v. Superior Court*,
2 Cal. 4th 1254 (1992) ............................................................................... 17

*Bay Cities Paving & Grading, Inc. v. Lawyers' Mut. Ins. Co.*,
5 Cal. 4th 854 (1993) .................................................................................. 18

*Boghos v. Certain Underwriters at Lloyd's of London*,
36 Cal. 4th 495 (2005) ................................................................................ 23

*Garcia v. Truck Ins. Exch.*,
36 Cal. 3d 426 (1984) ................................................................................. 18

*MacKinnon v. Truck Ins. Exch.*,
31 Cal. 4th 635 (2003) .......................................................................... 17, 18

*Waller v. Truck Ins. Exchange, Inc.*,
11 Cal. 4th 1 (1995) .................................................................................... 18

## STATUTES

Cal. Civ. Code § 1641 ...................................................................... 18, 23

Cal. Civ. Code § 1642 ............................................................................ 18

Cal. Civ. Code § 1644 ............................................................................ 18

Cal. Civ. Code § 1654 ............................................................................ 18

Cal. Code of Civil Proc. § 1858 ............................................................. 23

SQUIRE, SANDERS &
DEMPSEY L.L.P.
275 Battery Street, Suite 2600
San Francisco, California  94111

**NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD, PLEASE TAKE

NOTICE THAT on Friday, December 3, 2010, at 9:00 a.m., or as soon thereafter as the matter

may be heard, in Courtroom 7 of the above-entitled Court, located at 450 Golden Gate Avenue,

19th Floor, San Francisco, California, Defendant and Counter-Claimant Steadfast Insurance

Company ("Steadfast") will and hereby does move the Court for an Order granting the relief

sought by this Motion for Partial Summary Judgment.

By this Motion, Steadfast seeks a dispositive ruling on two causes of action in Plaintiff's

Complaint.  First, Steadfast seeks an Order pursuant to Fed. R. Civ. P. 56 granting partial

summary judgment for Steadfast on the Third Claim for Relief of Plaintiff United States of

America, acting on behalf of The Presidio Trust ("The Presidio Trust" or "The Trust"), holding

that no coverage exists under the Real Estate Environmental Liability Policy (the "REEL

Policy") for remediation activities relating to lead contamination in Mountain Lake because

(1) the lead pollution event occurred years before policy inception; (2) The Trust, Department

of Interior ("DOI"), National Park Service ("NPS"), the U.S. Army, and partner Golden Gate

National Parks Association ("GGNPA") knew of the lead pollution event at Mountain Lake

before policy inception; (3) any third-party claims by regulatory agencies to remediate

Mountain Lake were first made against The Trust before policy inception; and (4) any costs

The Trust is legally obligated to incur to remediate known conditions at Mountain Lake are

covered by the Remediation Stop-Loss Policy (the "RSL Policy"), as specifically requested by

The Trust at policy inception and subsequently by endorsement.  These undisputed facts fail to

satisfy the Insuring Agreements of Coverage A and Coverage B of the REEL Policy and trigger

its Known Condition Exclusion A.

Second, Steadfast seeks an Order pursuant to Fed. R. Civ. P. 56 granting partial

summary judgment for Steadfast on The Presidio Trust's First Claim for Relief, holding that

Steadfast has not breached either of its insurance contracts with The Trust, and that this Claim

for Relief is not ripe in any event, because (1) the REEL Policy bars coverage for the reasons

stated above; (2) all Mountain Lake remediation costs that The Trust has incurred to date have

**SQUIRE, SANDERS &
DEMPSEY L.L.P.**
275 Battery Street, Suite 2600
San Francisco, California  94111

STEADFAST'S NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT;
MEMORANDUM IN SUPPORT - Case No. CV08-5005-MMC

1  been for activities specifically endorsed onto the RSL Policy, with Steadfast adjusting all

2  reasonable and necessary costs under the RSL Policy, such that no alleged damages could exist

3  under the REEL Policy or the RSL Policy; and (3) no claim exists and no costs are due to The

4  Trust under the RSL because all costs (including all costs allegedly in dispute) remain within

5  The Trust's $100 million Self Insured Retention under the RSL Policy.[1]

6          This Motion is based upon this Notice of Motion and Motion for Partial Summary

7  Judgment and Memorandum of Points and Authorities, the Request for Judicial Notice ("RJN"),

8  the Declarations of Ethan A. Miller ("Miller Decl."), William A. Bir ("Bir Decl.") and John

9  Catts ("Catts Decl.") filed herewith, the reply papers to be submitted in support of this Motion,

10  upon such other or further papers as might be submitted in support of this Motion, upon the

11  record in this action, and upon oral argument to be presented to the Court in support of this

12  Motion at the hearing.

13              **MEMORANDUM OF POINTS AND AUTHORITIES**

14  **I.      INTRODUCTION AND STATEMENT OF ISSUES TO BE DECIDED**

15          In Count Three of this action, The Trust is asking the Court to decide whether costs

16  incurred by The Presidio Trust to remediate the pollution conditions at Mountain Lake are

17  covered under its REEL Policy—one of two environmental insurance policies issued by Steadfast

18  to The Presidio Trust in 1999.[2]  In 1999, The Trust took over operation and management of the

19  physical grounds in The Presidio from the United States Department of Defense, Department of

20  the Army (the "Army") with the purpose of transforming the military base into mixed-use

21  residential and commercial development and significant parkland.

22          There is no dispute that many sites at The Presidio were contaminated due to over 150

23  years of Army operations as an active military base.  *See* RJN, ¶ 7 and Ex. 7 at 2:3-18; Miller

24  Decl., Ex. 22 (Memorandum Of Agreement ("MOA")) at 1-5; and *id.*, Ex. 13-1 (Map of

---

[1]  The First and Third Causes of Action upon which Steadfast moves are set forth in the Trust's Complaint, RJN, Ex. 3.

[2]  Because the policies at issue in this litigation were issued by Steadfast Insurance Company, not Zurich American Insurance Company, and because Zurich Insurance Company has not been served in this matter, this motion is brought only on behalf of Steadfast.

SQUIRE, SANDERS &
DEMPSEY L.L.P.
275 Battery Street, Suite 2600
San Francisco, California 94111

STEADFAST'S NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT;
MEMORANDUM IN SUPPORT - Case No. CV08-5005-MMC

1   Summary of Environmental Conditions of Main Installation Sites).  During the 1990s, the Army

2   was in the process of remediating hundreds of sites with known contamination.  In 1997 and

3   1998, The Trust and other insureds DOI (including NPS), expressed serious concern in written

4   comments that the Army did not conduct adequate investigation and sampling of contamination at

5   the various sites (including Mountain Lake) to justify the Army's preferred remedial approach

6   and to conform with future planned residential and recreational uses.[3]  *See, e.g.*, Miller Decl.,

7   ¶ 24.

8            As a result of these concerns, Congress determined that The Trust, not the Army, should

9   have lead responsibility for remediating The Presidio, and provided The Trust $100 million to

10  remediate all known polluted sites at The Presidio by 2008.  16 U.S.C. § 460bb and appendix

11  thereto; Miller Decl., Ex. 22 (MOA) at 15, §§ 3.1 and 4.2.  As the 1999 transfer date was

12  approaching, The Trust was naturally concerned that it would be responsible for additional

13  remediation costs if government regulators found the Army's proposed remedial option to be

14  inadequate.  In the worst case scenario, The Trust would run out of Congressional funds and be

15  without funds to complete remediation of known sites.  Therefore, The Trust purchased an

16  environmental policy from Steadfast—the RSL policy—that would cover cost-overruns if the

17  cleanup of **known** contamination exceeded $100 million.  Miller Decl., Ex. 2.  The RSL Policy

18  provides coverage after The Trust has spent $100 million in response costs (the "Self Insured

19  Retention").  *Id*., Ex. 2 at P. 1.[4]  All known sites with active remediation were clearly identified

20  and listed on this policy under Table 1.  *Id.* Ex. 2 at P. 31-46; *see also* Miller Decl., Ex. 13-1

21  (Map of Summary of Environmental Conditions of Main Installation Sites).  The Trust listed

22  Mountain Lake on Table 1.  *Id.*, Ex. 2 at P. 32 (Table 1).  The Trust requested (and Steadfast

23  provided) that the RSL be flexible to account for potential changes in the proposed remediation

24  due to directives by governmental agencies.  *See, e.g.,* Miller Decl., ¶¶ 44-47.

25  _____

26  [3]  The Trust was required to be economically self-sufficient by 2014 from leasing revenue.  Miller
     Decl., Ex. 22 (MOA) at 2 (Recital H).

27  [4]  For the Court's convenience, Exhibits 1 (REEL Policy) and 2 (RSL Policy) to the Miller
     Declaration have been Bates stamped "MILLER DECL., EX. [], P. []."  All references herein to
28  "P." refer to those Bates numbers.

SQUIRE, SANDERS &
DEMPSEY L.L.P.
275 Battery Street, Suite 2600
San Francisco, California  94111

STEADFAST'S NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT;
MEMORANDUM IN SUPPORT - Case No. CV08-5005-MMC

1    The Trust was also concerned about **unknown** pollution in the remaining areas of the

2    Presidio.  As The Trust received no Congressional funding to remediate unknown pollution, The

3    Trust had to purchase a second Steadfast insurance policy—a REEL policy—to cover cleanup

4    costs of newly discovered and unknown pollution at The Presidio.  More specifically, the REEL

5    Policy was designed to address **unknown** pollution conditions first discovered after the inception

6    of the policies in May 1999 ("Coverage A") and as to which a claim is first made during the

7    policy period ("Coverage B").  *Id.*, Ex. 1 at P. 1.  The REEL Policy does not cover known

8    pollution conditions and contains an exclusion (Exclusion A) for the known contamination and

9    remediation activities at those sites that are specifically scheduled onto the RSL Policy.  *Id.*, Ex. 1

10   at P. 16.  Under the REEL Policy, The Trust pays the first $25,000 of liability for any unknown

11   contamination problem and Steadfast then covers certain costs above that amount (assuming all

12   other terms and conditions are met).  *Id.*, Ex. 1.  While the RSL Policy requires an expenditure of

13   $100 million before Steadfast must pay (and The Trust has spent only some $70 million to date),

14   the REEL Policy requires only $25,000.  Miller Decl., ¶¶ 50-51 and Exs. 54-55; *id.*, Exs. 1 and 2.

15   In this action, The Trust apparently alleges that coverage for the Mountain Lake

16   contamination falls under the REEL Policy even though it cannot be disputed that lead

17   contamination was known to exist in Mountain Lake well before the policies incepted.  *Id.*, Exs.

18   5-35, 36, 41 and 42.  It appears that The Trust is attempting to force cleanup of the Mountain

19   Lake site under the REEL Policy in order to take advantage of the relatively low $25,000

20   retention in that policy.  Coverage for remediation of lead contamination in Mountain Lake under

21   the REEL Policy, however, is barred by the plain terms of the policy and the wealth of evidence

22   that The Trust very well knew of the contamination before the Policy began.[5]

23   This motion seeks to adjudicate The Presidio Trust's Third Claim for Relief (Declaratory

24   Relief as to REEL Policy coverage) and First Claim for Relief (Breach of Insurance Contracts as

25   _____

26   [5]  Throughout this litigation The Trust has been purposely vague about whether it seeks coverage
     under the REEL or the RSL Policy.  Its Complaint is ambiguous on the point (RJN, Ex. 3) and in
27   deposition its Associate General Counsel charged with supervising this litigation evaded the
     question of which policy it is under which The Trust seeks coverage.  Miller Decl., ¶ 7, Ex. 6
28   (Andersen Depo. at 166:16-172:2 and 182:18-195:15).

SQUIRE, SANDERS &
DEMPSEY L.L.P.
275 Battery Street, Suite 2600
San Francisco, California  94111

to the REEL and/or the RSL).  As it makes clear, the REEL Policy was never intended to provide coverage for known contamination problems, such as those involved here.  Coverage is provided only for pollution "discovered by the insured during the policy period" and for pollution claims "first made against the insured during the policy period."  *Id.*, Ex. 1 at P. 13.  Likewise, under the very first exclusion in the REEL Policy, coverage is expressly precluded for any pollution "known to any Insured's principal, partner, director, officer or employee with responsibility for environmental affairs, legal affairs or risk management . . . ."  *Id.*, Ex. 1 at P. 16.  It is exceedingly clear, through document after document, that The Trust was well aware that Mountain Lake was contaminated with lead before the policies began.[6]  Miller Decl, ¶¶ 6-35.

More particularly, throughout the years leading up to the policies' inception, numerous articles appeared in local papers chronicling the pollution problems at the lake (*id.*, Exs. 30-32) and community members complained bitterly to the Presidio Restoration Advisory Board ("RAB") that lead and other contaminants so polluted the lake that local school children would not go near it.  *Id.*, Ex. 14 at 20:11-20 and Ex. 15 at 42:23-44:8 (RAB meeting transcripts dated December 10, 1996 and January 14, 1997, respectively).  The Trust and the NPS sat on the RAB and collected these articles.  *Id.*, ¶¶ 28-30.  The Trust was specifically aware of the problem also because it reviewed and had knowledge of the Army's environmental reports on Mountain Lake in 1997 and the environmental reports prepared in 1998 by its own consultant, leaving no doubt that there was lead contamination in Mountain Lake, and specifically, in the sediments at the site.  *See*, *e.g.*, *id.*, Exs. 12 and 23 (January 1, 1997 Dames & Moore Final Remediation Investigation Report and August 10, 1998 Dames & Moore letter to The Trust, respectively).  These reports and RAB meetings were incorporated into Endorsement 3 of the REEL Policy as ***excluded known pollution events***.  Miller Decl., Ex. 1 at P. 39-55; *see also* Miller Decl., ¶ 10 and Ex. 10 (excerpted copy of Exhibit 2 to the MOA).

Indeed, five months before the policies began, the Mountain Lake Project Team (which included The Trust) wrote an e-mail expressing "strong concern" that a report revealed lead levels

---

[6]  Perhaps not surprisingly, it is also clear that this claim was first made well before the policies incepted.  Miller Decl., ¶ 35 and Ex. 35.

SQUIRE, SANDERS &
DEMPSEY L.L.P.
275 Battery Street, Suite 2600
San Francisco, California  94111

1  *ten times* the threshold limit, an amount of pollution so high it "may constitute hazardous waste."

2  *Id.*, ¶ 16 and Ex. 17.  The Team then wrote:

3  > ***"This is preliminary and should not be distributed or discussed."***

4  The Mountain Lake Project supervisor who wrote this also testified in deposition that he

5  "absolutely" knew—before he retired in the middle of 1999—that the lake was polluted.  Miller

6  Decl., Ex. 18 at 118:20-119:7, 120:10-21 and 167:13 - 168:10.

7      Endorsement 3 to the REEL Policy makes clear that coverage for such undeniably known

8  pollution is precluded under the REEL Policy:

9  > All Pollution Events identified in Exhibit 2 to the MOA that are
> known to the Insureds are included in the attached Table 1 to this

10  > endorsement and thus are excluded from coverage under this
> [REEL] Policy pursuant to Section IV.A. of this Policy.

11

12  *Id.*, Ex. 1 at P. 39 (Endorsement 3).  Exhibit 2 to the MOA, in turn, not only lists Mountain Lake,

13  it includes reports specifically describing lead contamination in the water and sediment of the

14  lake—precisely the pollution that The Trust is currently addressing.  *Id.*, ¶ 10 and Ex. 10 at page

15  Bates stamped JAB 00561-62 and JAB 00871.

16      Where there is RSL coverage, there cannot be REEL coverage.  *Id.*, ¶ 8 and Ex. 7

17  (deposition testimony of the Trust's agent, Mr. Joshua A. Bloom, of McCutchen, Doyle,

18  Brown & Enersen ("McCutchen")).  The current Mountain Lake claim falls under the RSL

19  Policy.  *Id.*, Ex. 2 at P. 32.  Mountain Lake is listed on Table 1 to the RSL Policy as a site covered

20  by the RSL Policy.  This makes sense because, as set forth above, the lead contamination at

21  Mountain Lake was known to exist years before the policy began.  *Id.*, ¶¶ 6-35.

22      Against this, The Trust argues not only that it did not know about the lead contamination

23  until 2000 (Miller Decl., ¶ 9 and Ex. 9 (Rule 30(b)(6) deposition testimony of Eileen Fanelli) at

24  109:15-24), but also that coverage under the RSL policy is restricted to the specific activities

25  identified in Table 1 of the Scope of Work.  The Trust is mistaken.  In reality, The Trust

26  negotiated in earnest through its attorney (Mr. Bloom) at McCutchen and its broker at J&H Marsh

27  (now Marsh, Inc.) for wording in the RSL Policy that would mandate that all remedial activities

28  eventually required by a governmental agency at a site listed on Table 1 be covered under the

SQUIRE, SANDERS &
DEMPSEY L.L.P.
275 Battery Street, Suite 2600
San Francisco, California  94111

RSL Policy. *Id.*, ¶ 47 and Ex. 51. The Trust's agents for negotiating the RSL Policy requested that the scope of work be broad and flexible to cover any change in the scope of the remedial approach, such as the current mandate concerning Mountain Lake:

> The "Scope of Work" will include ***all*** tasks necessary to address
> remediation at the Enumerated Sites.

*Id.*, Ex. 48 at page Bates stamped ZS0000415. Consistent with a broad and flexible scope of work under the RSL Policy, in 2003, the parties executed Endorsement 10 to the RSL Policy, entitled "Scope of Work Modification Endorsement" and appended the following language to the RSL Scope of Work Endorsement for Mountain Lake:

> Prepare a Remedial Action Plan (RAP) and remedial design
> consistent with the most likely regulatory agency-required remedy
> of ***contaminated sediment excavation***, off-site disposal, relocation
> of surface water outfalls, and surface water monitoring.

*Id.*, Ex. 2 at P. 62 (Endorsement 10). After agreeing that these costs would be accounted for under the RSL Policy, The Trust now is suing Zurich for these costs, claiming they are covered under the REEL Policy. For the United States to now claim that a change in the scope of work at Mountain Lake to cover cost overruns for known pollution is not covered under the RSL Policy is not only contrary to the plain policy language, it is an about-face from the position taken during the negotiation of the policies.

In sum, the following terms under ***both*** policies make clear that the Mountain Lake claim cannot be covered under the REEL Policy:

- REEL Coverage A (pollution event must be discovered during policy period) (*Id.*, Ex. 1 at P. 13);

- REEL Coverage B (claim must be first made during the policy period) (*Id.*, Ex. 1 at P. 13);

- REEL Exclusion A (as to both REEL Coverage A and REEL Coverage B, no coverage for known pollution) (*Id.*, Ex. 1 at P. 16-17);

- Table 1 and MOA Exhibit 2 to both policies (Mountain Lake lead pollution a known pollution event) (*Id.*, Ex. 1 at P. 41 and Ex. 2 at P. 32);

STEADFAST'S NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT;
MEMORANDUM IN SUPPORT - Case No. CV08-5005-MMC

1      •      REEL Endorsement 3 (excluded known pollution events include Mountain Lake

2              lead contamination) (Miller Decl., ¶ 6 and Ex. 1 at P. 39);

3      •      RSL Exclusion I (including the exception thereto expanding coverage as scope of

4              work expands) (*Id.*, Ex. 2 at P. 16); and

5      •      RSL Endorsement 10 (Mountain Lake lead cleanup specifically covered under the

6              RSL Policy) (*Id.*, Ex. 2 at P. 62 (Scope of Work Endorsement 10)).

7    In light of these seven separate provisions, virtually any one of which would be sufficient to

8    disprove coverage under the REEL Policy for the Mountain Lake lead cleanup, it is difficult to

9    fathom how The Trust could ever have legitimately sued for coverage under that policy.

10          As there is no REEL Policy coverage for Mountain Lake lead pollution, not only does The

11   Trust's declaratory relief claim fail, its claim for breach of the REEL insurance contract also must

12   fail.  The Trust's alleged damages for amounts incurred thus far at Mountain Lake constitute costs

13   for work specifically endorsed onto the RSL Policy on Endorsement 10.  Given that Steadfast

14   cannot have a duty to pay any amounts under the RSL Policy until The Trust exceeds the $100

15   million Self Insured Retention (which has not happened, *see* Miller Decl., ¶¶ 50-51 and Exs. 54-

16   55), and that Steadfast has adjusted all reasonable and necessary Mountain Lake remediation

17   expenses under the RSL (*see* Catts Decl., ¶ 3), there has been no denial of policy benefits.

18   Without a denial of policy benefits (*i.e.,* contract damages), The Trust's RSL breach of contract

19   claim fails.

20          In suing Steadfast, The Trust focuses on the wrong party.  Regardless of whether Zurich

21   were compelled to pay for cleanup of Mountain Lake under the REEL Policy, Mountain Lake

22   will be cleaned up by the responsible party—the California Department of Transportation

23   ("Caltrans").  In 2009, The Trust commenced an action against Caltrans to clean up the same

24   contamination of Mountain Lake that is herein at issue.  RJN, ¶ 1 and Ex. 1.  In that action, The

25   Trust has alleged that, pursuant to a 1938 Agreement whereby Caltrans was granted the right to

26   construct Park Presidio Boulevard, Caltrans agreed to bear responsibility for all damage

27   emanating from the use of Park Presidio Boulevard.  *Id.*, Ex. 1.  More particularly, The Trust

28   alleges that Caltrans' "construction, operation and maintenance of Park Presidio Boulevard has

-8-

SQUIRE, SANDERS &
DEMPSEY L.L.P.
275 Battery Street, Suite 2600
San Francisco, California  94111

STEADFAST'S NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT;
MEMORANDUM IN SUPPORT - Case No. CV08-5005-MMC

1    introduced and continues to introduce lead, zinc, copper and other substances into Mountain

2    Lake."  RJN, Ex. 1 at 7, ¶ 38.  As The Trust alleges, all available evidence demonstrates that the

3    lead contamination of Mountain Lake emanated from Park Presidio Boulevard.  The Trust

4    therefore demands that Caltrans "shall, at its own expense, remediate all damage to Mountain

5    Lake . . . ."  *Id.*, Ex. 1 at 12, ¶ 2.  That case continues apace in this Courthouse.

6         In sum, the Court should find that, under the plain meaning of both policies, the REEL

7    Policy does not cover Mountain Lake cleanup costs and Steadfast has breached neither the REEL

8    nor the RSL policies.  If The Trust needs immediate "dollar one" coverage for its costs at

9    Mountain Lake, it should devote its resources to recovery from the party contractually bound to

10   respond—Caltrans.

11   **II.    STATEMENT OF FACTS**

12        **A.    The Trust's Knowledge And Discovery Of The Lead "Pollution Event" At
              Mountain Lake**

13

14        The Army controlled and used The Presidio as a military base from the mid-19th Century

15   until 1994, when it transferred control to the DOI/NPS.  RJN, Ex. 3, ¶ 13.  In 1997, The Presidio

16   Trust was created and assumed control over the portion of The Presidio that includes Mountain

17   Lake.  *Id.*, ¶¶ 14-15.  Beginning in the late 1980s and continuing through the late 1990s, in

18   preparation for closure of the Army base at The Presidio and the transfer of control to the NPS

19   and The Trust, the Army engaged in a lengthy investigation and remediation of contamination at

20   the Presidio.  Miller Decl., Ex. 12 at § 1.1 ("Dames & Moore 1997 Report").  The Dames &

21   Moore 1997 Report included an analysis of surface water and sediment testing performed at

22   Mountain Lake, which tests indicated that there were elevated levels of lead in sediment, and

23   cyanide, iron and lead in surface water.  *Id.*, Ex. 12 at § 10.7.4.

24        After The Presidio Trust retained control over a portion of The Presidio, it formed

25   a Mountain Lake Project Team in partnership with the NPS and the GGNPA to investigate and

26   clean up Mountain Lake.  *See* Miller Decl., ¶¶ 22, 36-37 and Exs. 17, 18, 24 and 37-42.  GGNPA

27   was tasked with coordinating the investigation and cleanup of the lake.  *Id.*, ¶ 22 and Ex. 24.[7]  In

28   ─────────────────────
     [7]  Certainly, The Trust itself was fully aware of the pollution in the lake before the policies began.

STEADFAST'S NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT;
MEMORANDUM IN SUPPORT - Case No. CV08-5005-MMC

1    connection with that effort, the GGNPA and The Trust commissioned testing of the lake sediment

2    to determine proper methods of disposing of the dredged material.  *See id.*, Ex. 11 at 1 (Erler &

3    Kalinowski, Inc. ("EKI") Report of Sediment Sampling at Mountain Lake, The Presidio, Presidio

4    Trust, San Francisco, California (November 19, 1998) (the "EKI 1998 Report")).  The EKI 1998

5    Report, issued six months before the REEL Policy period, stated, in part:

6            Cadmium and lead were detected at concentrations of .24 mg/kg
             and 93 mg/kg, respectively, in the sediment sample from borehole
7            ML-1.  The cadmium concentration ***exceeds the recommended
             cleanup level*** of 0.19 mg/kg for soil at the Presidio.  The lead
8            concentration ***exceeds ten times*** the Soluble Threshold Limit
             Concentration ("STLC"), i.e., 50 mg/kg, which indicates that lead
9            may exceed the STLC of 5 mg/L if the sediment sample is
             subjected to the Waste Extraction Test.  ***Such sediments may be
10           classified as a hazardous waste.***

11   *Id.*, Ex. 11 at 5 (emphasis added).  On November 19, 1998 (six months before the policies

12   incepted), the EKI 1998 Report was sent directly to The Presidio Trust's Environmental

13   Remediation Manager, who subsequently provided a copy of the report to the Department of

14   Toxic Substances Control ("DTSC").  *Id.*, Ex. 11 at 1 and Ex. 21 at 1.

15           After seeing the EKI results, the NPS and GGNPA wrote as follows, on January 8, 1999

16   (five months ***before*** the policies began):

17           I'm concerned about these lead data . . .  All the results exceed
             50 mg/kg—10x the Soluble Threshold Limit . . .  All but one of the
18           results exceed 477 mg/kg—the Recommended Ecological Cleanup
             Level . . .

19                                  *    *    *

20           1/8/99:  I called Tamara [Williams—at NPS] —expressed strong
21           concern.  ***This is preliminary and should not be discussed or
             distributed*** . . .

22   ────────────────────────────────────────────────────────────

     Even if it chose to bury its head in the sand and was now to argue that it was blissfully unaware of
23   what GGNPA or the NPS knew, that could not carry the day.  The Trust, NPS and the GGNPA
     were all on the Mountain Lake Restoration Project together, The Trust specifically delegated to
24   the GGNPA environmental investigation and cleanup of Mountain Lake and they all sat on the
     RAB together.  Miller Decl., Ex. 24.  Moreover, many of the NPS and GGNPA environmental
25   employees ***became*** Presidio Trust employees after The Trust was formed.  *Id.*, ¶ 37.  Finally, the
     REEL Policy precludes coverage for pollution that ***any*** insured knew of, and insured is defined to
26   include The Trust, the NPS (DOI) ***and*** any of its partners.  There is no question that, certainly as
     regards the Mountain Lake Project Team and its cleanup objective, The Trust, NPS and GGNPA
27   were partners.  *Id.*, ¶¶ 22, 36-37, Exs. 17, 18, 24 and 37-42.  Mr. Archbald stated in deposition
     that "this project [the Mountain Lake Project] was a joint effort between the Parks Association,
28   the National Park Service, and the Presidio Trust".  *Id.*, Ex. 18 at 82:5-23.

SQUIRE, SANDERS &
DEMPSEY L.L.P.
275 Battery Street, Suite 2600
San Francisco, California  94111

1   Miller Decl., ¶ 16 and Ex. 17 at page Bates stamped USA0266410.  Mr. Archbald testified that he

2   may have written the latter because notice of lead in the lake would have "alarmed" the local

3   community.  *Id.*, Ex. 18 at 86:20-22.  Perhaps most significantly, Mr. Archbald testified:

> Q:      So you are saying that you didn't believe before your
>         retirement (in 1999) that Mountain Lake was polluted?
>
> A:      Oh, no.  I thought it had some sort – some forms of
>         pollution in it, yeah, definitely.  Absolutely.  I'm not
>         contesting that.  I just don't—I wouldn't call it a toxic
>         wasteland.

8   Miller Decl., Ex. 18 at 167:13-168:10 (Archbald Deposition).

9       A year later, a U.C. Berkeley professor who had studied the lake accused The Trust and

10  GGNPA of downplaying the lead results, and The Trust (or GGNPA) called U.C. Berkeley's

11  General Counsel to threaten the professor with a defamation lawsuit if he did not "shut up" about

12  The Trust and GGNPA concealing the lead levels.  Miller Decl., Ex. 25 and ¶ 23.

13      Major local newspapers, including the San Francisco Chronicle, reported on high levels of

14  lead in Mountain Lake from 1996 to 1998.  Many of these original articles were torn out of the

15  San Francisco Chronicle and placed in the NPS and The Trust's own files, where Steadfast located

16  them (only after moving to compel their production).  Miller Decl., ¶¶ 28-30 and Exs. 30-31.  At

17  the same time, the Remediation Advisory Board (composed of representatives from GGNPA, NPS

18  and The Trust) held community meetings in which lead contamination in Mountain Lake was

19  repeatedly discussed.  *Id.,* Exs. 14 and 15.  Indeed, as early as 1996, journalists told the RAB that

20  Mountain Lake "is very toxic.  It's toxic because of lead from the Army rifle range and from

21  a freeway that goes by."  Miller Decl., Ex. 14 (December 10, 1996 RAB meeting transcript at

22  20:11-20).[8]

23

24  [8]  The RAB, comprised of members from the Presidio Trust, U.S. Army, NPS, U.S.
Environmental Protection Agency ("EPA"), California Regional Water Quality Control Board,
San Francisco Bay Region (Region 2) ("RWQCB") and the DTSC, was an entity established by
25  the U.S. Army, the Presidio Trust and the NPS, whose mission was to "create an open and
interactive partnership through which communities, agencies and public stakeholders work to
26  produce consensus decisions that restore the environment while incorporating the interests of The
Trust as Lead Agency as well as the needs and acceptance of the local community."  Miller Decl.,
27  Ex. 56 (RAB Charter and Bylaws).  It operated as a clearing house of knowledge about
contamination at The Presidio.

28

STEADFAST'S NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT;
MEMORANDUM IN SUPPORT - Case No. CV08-5005-MMC

1    The Army repeatedly tried to downplay lead in Mountain Lake, urging that it was not

2  responsible for lead contamination because the source was stormwater runoff from the CalTrans

3  Right of Way.  But before The Trust received the $99 million—before the policies incepted—The

4  Trust repeatedly disagreed with the Army's downplaying of lead in Mountain Lake, arguing that it

5  was substantially more dangerous than the Army asserted.  Miller Decl., Ex. 26.  (It appears that

6  after receiving funding from the Army, The Trust changed course and adopted the Army's

7  disinterest in the lead contamination.)

8       **B.       Cleanup Of Mountain Lake**

9    Cleanup of Mountain Lake has taken much longer than The Presidio Trust originally

10  contemplated.  During the underwriting process in 1998 and 1999, The Trust assumed that

11  Mountain Lake would be cleaned up by November 2008.  Miller Decl., Ex. 2 at P. 47

12  (Endorsement 2, Table 2 ("Anticipated Remediation Schedule for the Insured Project")).  Instead,

13  as of now, The Trust is still investigating the extent of the contamination and has not finalized the

14  cleanup plan.  *Id.*, Ex. 54 at Attachment 1, Appendix B at 15.  Indeed, no cleanup of the Lake has

15  even commenced.  *Id.*  The Trust now estimates remediation planning to conclude in late 2012,

16  remediation to begin April 1, 2013 and conclude March 31, 2014, and obtaining DTSC

17  certification on July 1, 2014, which is ***after*** the RSL Policy expires.[9]  *Id.*

18       **C.       The Insurance Policies**

19           **1.       The REEL Policy**

20    Between 1998 and May 1999, Steadfast and The Presidio Trust negotiated the terms of the

21  RSL and REEL insurance policies.  *Id.*, Exs. 1 and 2.  McCutchen, Doyle—on behalf of The

22  Trust—drafted many of the policy terms; these were ***not*** "standard" policies prepared only by the

23  insurers but were unique, highly negotiated policies.  Miller Decl., ¶ 39 and Ex. 7 (Bloom Depo.

24  Tr. at 49:20-50:25 and 62:17-63:7).

25  _____

26  [9]  As with Mountain Lake, The Trust is behind its original schedule with respect to a number of sites.  Miller Decl., ¶ 50 and Ex. 54 at Attachment 1 at 3-4.  Moreover, The Trust is expecting total cost overruns well in excess of the original estimated costs of remediation of known sites

27  (*i.e.*, more than $137 million).  *Id.*, ¶ 50 and Ex. 54 at Attachment 1, Appendix A, Table 2A.  As of the present, The Trust has incurred only approximately $71 million for environmental

28  remediation under the RSL.  *Id.*

SQUIRE, SANDERS &
DEMPSEY L.L.P.
275 Battery Street, Suite 2600
San Francisco, California  94111

-12-

STEADFAST'S NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT;
MEMORANDUM IN SUPPORT - Case No. CV08-5005-MMC

The REEL Policy is a "claims-made" policy and contains two "Insuring Agreements," known as Coverage A and Coverage B, wherein Steadfast agreed as follows:

### COVERAGE A: FIRST PARTY CLEAN UP

> To pay on behalf of an **Insured** any **Cleanup Costs** required by **Governmental Authority** as a result of a **Pollution Event** on, at or under a **Covered Location(s)** discovered by the **Insured** during the **Policy Period** provided that the **Claim** is reported to the Company during the **Policy Period** or any renewal thereof, or any applicable Extended Reporting Period.  Coverage for **Claims** due to changes in **Governmental Authority** during any applicable Extended Reporting Period is set out in Section V [Extended Reporting Periods].

### COVERAGE B: THIRD PARTY LIABILITY

> To pay on behalf of an **Insured** any **Loss** caused by a **Pollution Event** on, at, under or coming from a **Covered Location(s)** that an **Insured** is legally obligated to pay as a result of **Claim(s)** first made against the **Insured** during the **Policy Period** provided that the **Claim** is reported to the Company during the **Policy Period**, any renewal thereof, or any applicable Extended Reporting Period.

Miller Decl., Ex. 1 at P. 13 (Section I).

As stated, coverage under Coverage A and Coverage B requires the existence of a "Pollution Event," which is defined, in pertinent part, as "(a) the discharge, dispersal, release, or escape of any solid, liquid, gaseous or thermal irritant, contaminant or pollutant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste . . . ."  *Id.*, Ex. 1 at P. 16 (Section II.P). Both Coverage A and Coverage B require that any claim or discovery arising from a Pollution Event be made against The Trust and reported to Steadfast during the policy period (i.e., after May 24, 1999).  If discovery occurs before the policy period, or if The Trust receives a claim before the policy period, the Insuring Agreement of Coverage A and B are not satisfied, and there is no coverage under the REEL Policy.

Under the REEL Policy, the "Insured" includes The Trust, the DOI (including the NPS) and, to a certain extent, the United States of America.[10]  Miller Decl., Ex. 1 at P. 1 (Declarations)

---

[10]  The REEL Policy provides that the United States is an Insured "to the extent of Claims or Loss arising out of the activities, liabilities and obligations of The Trust and Department of Interior at the Covered Location [the Presidio]."  Miller Decl., Ex. 1 at P. 1 (Declarations).

STEADFAST'S NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT; MEMORANDUM IN SUPPORT - Case No. CV08-5005-MMC

1   and P. 15 (Section II.I).  But it also includes ***partners*** of the NPS and The Trust, including the

2   GGNPA.  Miller Decl., ¶¶ 22, 36-37 and Exs. 17, 18, 24 and 37-42.

3        Exclusion IV.A. of the REEL Policy excludes coverage for "any **Pollution Event** known

4   to any **Insured's** principal, partner, director, officer or employee with responsibility for

5   environmental affairs . . ." unless before the policy began, the Pollution Event was "endorsed onto

6   the Policy."  *Id.*, Ex. 1 at P. 16-17.  As set forth below, responsible employees of The Trust knew

7   about the contamination entering into the Lake well before the Policy began.

8        Endorsement 3 follows up on the "known contamination" language found in

9   Exclusion IV.A. and states:

10
11
12
> [A]ll Pollution Events identified in Exhibit 2 to the MOA that are
> known to the Insureds are included in the attached Table 1 to this
> endorsement and thus are excluded from coverage under the Real
> Estate Liability policy pursuant to Section IV. A. of this policy.

13   *Id.*, Ex. 1 at P. 39 (Endorsement 3).  Endorsement 3 was proposed by The Trust's agent and

14   attorney, Joshua Bloom.  Miller Decl., Ex. 48 at ZS0000417.  Table 1 is titled "Known Pollution

15   Events Listed in Table 1 Endorsement."  *Id.*, Ex. 1 at p. 39-55.  Table 1 includes monitoring of

16   Mountain Lake for its known lead contamination as set forth in Exhibit 2 to the MOA.  *Id.* at

17   p. 41.

18           **2.**    **The RSL Policy**

19        The RSL Policy began in May 1999 and expires in 2014.  *Id.*, Ex. 2 at P. 1 (Declarations,

20   Item 2).  The RSL Policy insures against the risk of cost overruns in excess of $100 million to

21   remediate scheduled sites with ***known*** contamination.  The Insuring Agreement provides

22   coverage to "pay to the **Named Insured** any **Loss** arising out of the **Insured Project** designated

23   in the Declarations which results from costs exceeding the **Self Insured Retention(s)**."  *Id.*, Ex. 2

24   at P. 13 (Section I).  The Insured Project is defined in the Declarations as the remediation of the

25   Presidio "as described by the Scope of Work Endorsement."  *Id.*, Ex. 2 at P. 25.  The Insured

26   Project is further defined by the Scope of Work Endorsement.  Table 1 of the Scope of Work

27   Endorsement (page 1 of 5) includes activities that:

28

**SQUIRE, SANDERS & DEMPSEY L.L.P.**
275 Battery Street, Suite 2600
San Francisco, California  94111

1
2
3
4
5
6
7

> . . . represent the remedial approach planned by the Presidio Trust that *may be necessary based on available data and current understanding of conditions existing at each site*. In addition to those activities listed in Table 1, the Scope of Work of the Insured Project includes but is not limited to all permitting, sampling, construction, restoration, reporting, and other tasks and items associated with and necessary to implement the activity as listed in Table 1 for each site required by any regulatory agency, other than the United States Department of the Interior or the United States Department of Defense, Department of the Army, *or required pursuant to applicable federal, state, or local statutes, regulations or ordinances*.  (Emphasis added.)

8   The Trust prepared Table 1 and submitted it to Steadfast for inclusion into the RSL

9   Policy.  During policy underwriting, The Trust insisted that the RSL Policy's Scope of Work

10  would be "broad and flexible" and would include remediation of all substances at the Enumerated

11  Sites.  *See, e.g.,* Miller Decl., ¶ 46 and Ex. 50 (February 9, 1999 letter from Zurich to

12  Ms. Nesterenko, responding to the "comments of Joshua A. Bloom of McCutchen, Doyle, Brown

13  and Enersen dated January 6, 1999").  The sites known to be contaminated are listed on Table 1

14  to the RSL Policy.  *Id.*, Ex. 2 at P. 49 (Endorsement 3) and P. 31-46 (Table 1).  Mountain Lake is

15  listed on Table 1.  *Id.* at P. 32.  The initial activity listed for Mountain Lake was to "[m]onitor

16  surface water and perform biological verification sampling."  *Id.*  Accordingly, the RSL was

17  modified in various places to allow for changes in the Scope of Work.  For example, Exclusion I

18  initially precluded coverage for any changes in the Scope of Work, but was modified to include

19  the following exception to Exclusion I:

20
21
> This insurance does not apply to Loss or Claims based upon or arising out of:
>
> *      *      *

22
23
24
25
> I.      a change in the Scope of Work or material change in the schedule of activities in the Scope of Work designated in the Scope of Work Endorsement to this Policy unless such change is agreed to by the Company, such agreement not to be unreasonably withheld, and so endorsed in the Policy; *however this exclusion shall not apply to any change in the Scope of Work required by any regulatory agency* . . .

26  *Id.*, Ex. 2 at P. 16 (Endorsement 2) (emphasis added).  If the RSL Policy did not cover changes in

27  the scope of work or even material changes in the activities, there would have been no need to

28

-15-

SQUIRE, SANDERS &
DEMPSEY L.L.P.
275 Battery Street, Suite 2600
San Francisco, California  94111

1   include this exclusion.

2          The RSL Policy also provides a reporting process for The Trust to follow to report any

3   changes in the Scope of Work and any expected increases in costs due to such changes.  *Id.*, Ex. 2

4   at P. 19 (section VII.A.).  Again, if the RSL was never intended to cover any changes in the

5   Scope of Work, there would be no need for The Trust to report such changes and costs under the

6   RSL.

7          Amending the Scope of Work endorsement to cover further activity to address known

8   contamination is by no means the exception, but rather the rule for the past 11 years of claims

9   adjusting under the RSL.  Indeed, the parties have executed no fewer than fifteen (15) separate

10  Scope of Work Modification Endorsements.  *Id.*, Ex. 2 P. 49, 59-79 (Endorsements Nos. 3, 8-21).

11  Thus, under the RSL Policy, where the remedy for a given contaminated area might change, the

12  parties can adjust for that and execute a scope of work modification.  They did just that at

13  Mountain Lake.  Miller Decl., Ex. 2 at P. 62 (Endorsement 10).[11]  Pursuant to this understanding

14  and the coverage provided under Endorsement 10, Steadfast has adjusted all reasonable and

15  necessary allowable Mountain Lake remediation costs under the RSL Policy.  Catts Decl., ¶ 3.

16         Consistent with Exclusion I (including the exception thereto), The Trust in 2003 asked

17  Steadfast to endorse the RSL to specifically cover the cost of preparing a RAP to address water

18  and sediment pollution at the Mountain Lake site.  Miller Decl., Ex. 2 at P. 62 (Endorsement 10).

19  This Endorsement provides that the latest proposed activity for Mountain Lake is to "[p]repare a

20  Remedial Action Plan (RAP) and remedial design consistent with the most likely regulatory

21  agency-required remedy of contaminated sediment excavation, off-site disposal, relocation of

22  surface outfalls, and surface water monitoring."  *Id.*  The official Mountain Lake RAP—

23  preparation of which either has not begun or only just began in April 2010—has not been

24  implemented on the site.  *Id.*, Ex. 54 at Attachment 1 at 7, Appendix B at 15.

---

25  [11]  On numerous occasions, Steadfast has asked The Presidio Trust to provide confirmation of
    a legal obligation to remediate Mountain Lake.  Bir Decl., Ex. 6 at 17.  Although The Trust
26  previously declined to provide that confirmation, it has now stated, in discovery, that it is relying
    on a Consent Agreement with, and two letters from, the DTSC to establish that legal obligation.
27  Miller Decl., Ex. 4 at Interrogatory Nos. 1, 3.  Thus, where the DTSC requires The Trust to
    undertake further Mountain Lake cleanup activities, such as lake dredging, the further cleanup
28  would constitute additional covered expenses under the RSL Policy.

STEADFAST'S NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT;
MEMORANDUM IN SUPPORT - Case No. CV08-5005-MMC

Thus, the costs incurred to date claimed by The Presidio Trust relate to items that the parties have agreed are covered under the RSL Policy through Endorsement 10.  *See id.*, Ex. 3 at 11; *id.*, Ex. 2 at P. 62-63 (Endorsement 10).  In Endorsement 10, the parties agreed that site investigation costs (preparation of the RAP) are covered under the RSL.  The only costs incurred to date are investigation costs, and the RAP itself certainly is nowhere near completion.[12]

### D.      Steadfast Has Acknowledged "Coverage" under the RSL Policy

Because the RSL Policy does not require any payment by Steadfast until The Presidio Trust has spent $100 million, the concept of "coverage" is a bit of a misnomer; because The Trust currently has not spent more than $70 million, it has no current "coverage" obligation.  Steadfast has, however, agreed in Endorsement 10 that The Trust's current obligations with respect to Mountain Lake fall under the RSL Policy and has accounted for all reasonable and necessary expenses to address the current Mountain Lake claim under the RSL Policy, so as to count toward exhaustion of that Policy's $100 million retention.

## III.    DISCUSSION

### A.      Legal Standards Applicable to Contract Interpretation in California

The general rules of contract interpretation apply to all contracts in California, including insurance policies.[13]  *Northrop Grumman Corp. v. Factory Mut. Ins. Co.*, 563 F.3d 777, 783 (9th Cir. 2009) (citing *Bank of the W. v. Superior Court*, 2 Cal. 4th 1254 (1992); *MacKinnon v. Truck Ins. Exch.*, 31 Cal. 4th 635 (2003)).  Contract interpretation must give effect to the "mutual intent" of the parties when the contract was formed, which should "be inferred, if possible, from

---

[12]  Although The Trust's Complaint alleges that "The Trust has incurred approximately $807,271 in ***clean up*** costs at the Mountain Lake sediment site" (*see* RJN, Ex. 3 at ¶ 25 (emphasis added)), its Rule 26 Initial Disclosures confirm that its current "[d]amages [are] for costs expended ***investigating*** Mountain Lake site in the approximate amount to date of $807,271."  Miller Decl., Ex. 3 at 11 (emphasis added).  The Trust recently informed Steadfast that "some delays in anticipated project milestones have occurred," including that the "[c]ompletion of the draft RAP for Mountain Lake has been extended into late 2010."  *Id.*, Ex. 54, Attachment 1 at 3.  Indeed, the Mountain Lake "Remedial Construction Work Plan" and "Plans, Specs, [and] Contractor Selection"—the next stages in the "Planning" stage after "RAP Approval"—are not scheduled to begin until at least April 2012, with "Remediation/Construction" not starting until at least April 2013.  *Id.*, Ex. 54 at Attachment 1, Appendix B at 15.

[13]  The parties agree that California law regarding insurance coverage governs this dispute.  RJN, Ex. 2 at 6:13-15.

the written provisions of the contract based on their ordinary and popular sense, unless a technical

sense or special meaning is given to them by their usage." *Id.* (internal quotations and citations

omitted); Cal. Civ. Code § 1644; *American Alternative Ins. Corp. v. Superior Court*, 135 Cal.

App. 4th 1239, 1245, 1237 (2006).  Thus, "[i]f the contractual language is clear and explicit, it

governs." *Northrop Grumman Corp.*, 563 F.3d at 783 (citing *MacKinnon,* 31 Cal. 4th 635; *AIU

Ins. Co. v. Superior Court*, 51 Cal. 3d 807 (1990)).

The Court must consider the contract as a whole and interpret the language in context,

rather than interpret a provision in isolation.  Cal. Civ. Code § 1641; *American Alternative Ins.

Corp.*, 135 Cal. App. 4th at 1245.  More than one contract (*i.e.,* both the RSL and the REEL

Policies) entered into between the same parties, dealing with the same subject matter and entered

into as a part of one transaction, shall be considered together.  Cal. Civ. Code § 1642.

Only where a policy term is capable of more than one reasonable interpretation can an

ambiguity exist.  *Waller v. Truck Ins. Exchange, Inc.*, 11 Cal. 4th 1, 18 (1995); *Bay Cities Paving

& Grading, Inc. v. Lawyers' Mut. Ins. Co.*, 5 Cal. 4th 854, 867 (1993).  As a rule of last resort,

where an ambiguity exists as to the meaning of policy terms, and that ambiguity is not otherwise

resolvable, the ambiguity is construed against the drafter.  Cal. Civ. Code § 1654.  This is known

as the doctrine of *contra proferentum*.  This doctrine, however, has no application where both

parties are sophisticated and where they ***both*** drafted the policy language.  *Garcia v. Truck Ins.

Exch.*, 36 Cal. 3d 426, 438 (1984).  The policy language here at issue is unambiguous and, even if

there were any ambiguity, there is no question but that both parties drafted the policies together

and that The Trust was represented by very capable counsel, well-steeped in insurance law and

environmental liability.  *See* Bir Decl., Ex. 1; Miller Decl., Ex. 43; *see also id.*, ¶¶ 38-42.

**B.**      **The Presidio Trust's Claims as to Mountain Lake Fail As A Matter Of Law[14]**

**1.**      **No coverage is available under the REEL Policy for Mountain Lake.**

In order to establish coverage under the REEL Policy—as would be required for The

---

[14]  Because of the length of this brief, Steadfast has elected to focus only on the Mountain Lake
claim.  A very similar analysis pertains to the only other claim at issue in this litigation—Building
937.  Steadfast believes that once the Court gives guidance to the parties by adjudicating the
Mountain Lake claim, the balance of the Complaint will be dismissed.

SQUIRE, SANDERS &
DEMPSEY L.L.P.
275 Battery Street, Suite 2600
San Francisco, California  94111

1  Presidio Trust to prevail on its declaratory relief claim—The Trust must demonstrate, among

2  other things, that the lead Pollution Event requiring the cleanup of Mountain Lake was not known

3  to it before the policy incepted and that the claim was first made during the policy period.  The

4  Trust cannot do so.

5

6  
        **a.**        **REEL Coverage Part A does not apply because The Presidio Trust discovered the contamination before the policy period.**

7          Coverage Part A of the REEL Policy requires that a Pollution Event is "discovered by the

8  insured during the Policy Period."  Miller Decl., Ex. 1 at P. 13.  Indisputably, the "Pollution

9  Event" here is "the discharge, dispersal, release, or escape" of a "contaminant or pollutant" (in

10  this case, lead), from the Caltrans right-of-way bordering Mountain Lake.  *Id.*, Ex. 1 at P. 16.  The

11  Mountain Lake sediment contamination at issue is the result of discharges from the storm drains

12  of Park Presidio Boulevard (the Caltrans right-of-way through the Presidio) that occurred decades

13  ago when leaded gasoline was still in use and lead emissions deposited onto the ground were

14  washed via stormwater into Mountain Lake.  RJN, Ex. 1, ¶¶ 32, 38.  As shown above, The Trust

15  and NPS (insureds under the policy) and their partner, GGNPA, have long been aware that

16  discharges from the Caltrans right-of-way caused lead contamination in Mountain Lake water and

17  sediment.  Steadfast refers the Court to the legion of evidence attached to the Miller Declaration

18  at Exhibits 11, 13-15, 17-18, 21, 29-32 and 41, including evidence that:

19       •     The policy itself incorporated environmental reports, sent to The Trust's own

20            Environmental Remediation Manager *in 1998*, finding that lead contamination

21            existed at such levels that the sediment may be classified as hazardous waste

22            (Miller Decl., ¶¶ 10 and 18 and Exs. 11 and 21);

23       •     The Trust's partners were aware of these reports by *early 1999* and expressly

24            sought to keep them under wraps because the lead levels may "alarm" the lake

25            community (*id.*, ¶ 16 and Exs. 17-18);

26       •     Numerous Restoration Advisory Board meetings were held in *1996 and 1997*

27            during which the NPS and GGNPA were told that the lake was "toxic" (*id.*, ¶ 14

28            and Exs. 14-15);

1      •       Other reports, which the GGNPA and NPS were aware of in **1998 and early 1999**,

2              stated that lead in the sediment of the lake was a "contaminant of concern" (*id.*,

3              ¶ 13 and Ex. 13);

4      •       The NPS was aware of a report from as early as **1993** that lead contamination

5              existed in the lake at levels "exceed[ing] maximum background soil

6              concentrations" (*id.*, ¶ 26 and Ex. 29);[15]

7      •       The GGNPA senior Mountain Lake restoration officer admitted in deposition that

8              he "absolutely" knew by **1999** that the lake was polluted (*id.*, ¶ 27 and Ex. 18); and

9      •       The NPS' restoration officers collected numerous newspaper articles from **1996 to**

10             **1998** discussing the lead contamination and was in fact **quoted** in one of these

11             articles (*id.*, ¶¶ 28-31 and Ex. 30-32 and 42).

12     Therefore, Coverage Part A is not triggered because the Mountain Lake lead pollution event was

13     discovered by the insureds prior to the REEL policy period.

14
                        **b.       REEL Coverage Part B does not apply because the Mountain**
15                      **Lake claim was first made before the policy period.**

16             The Presidio Trust claims that Coverage Part B is triggered because the California DTSC

17     first claimed that The Trust had to address Mountain Lake pollution in 2001.  Miller Decl., Ex. 8.

18     Not so.  Well before the REEL policy began, the DTSC was requiring it to enter into a Consent

19     Agreement to investigate and remediate Mountain Lake on pain of civil penalties.  Miller Decl.,

20     Ex. 35 (draft Consent Agreement (at 1) and Ullensvang transcript (at 58:21-25 and 60:15-19)).

21     The Trust's attorney testified that he understood before the REEL Policy began that the Consent

22     Agreement set forth requirements by the DTSC.  *Id.*, Ex. 7 (Bloom Depo. Tr. at 155:3-156:4).

23     Those requirements included sampling Mountain Lake for lead.  *Id.*, Ex. 35 at 16 and Ex. 41

24
       _____

25     [15]  The Trust contends that contamination must reach some "threshold" level before there is a
       "Pollution Event."  But not only does the definition of Pollution Event not include any such
26     "threshold" requirement, Zurich specifically told The Trust in the underwriting process that
       "'pollution event' is not tied to any specific contaminant level."  Miller Decl., Ex. 52.  The
27     Trust's negotiating agent conceded in deposition that he was unaware of any policy language
       requiring contamination to reach some threshold level before it would be deemed a "pollution
28     event."  Miller Decl., ¶ 48 and Ex. 7 (Bloom Depo. Tr. at 138:23-139:3).

SQUIRE, SANDERS &
DEMPSEY L.L.P.
275 Battery Street, Suite 2600
San Francisco, California  94111

STEADFAST'S NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT;
MEMORANDUM IN SUPPORT - Case No. CV08-5005-MMC

1   (Ullensvang Depo at 227:1-15) and preparation of a final RAP (the same activity for which The

2   Trust now seeks coverage under the REEL Policy).  *Id.*  Therefore, the claim was necessarily

3   made before the Policy incepted and there can be no coverage under Part B.[16]

4                    **c.        REEL Exclusion A—and Endorsement 3—bars coverage for**
                              **remediation of the known contamination at Mountain Lake**
5                             **under both Coverage Parts A and B.**

6              Even if Coverage Parts A or B could be triggered, Exclusion A would still preclude

7   coverage under the REEL Policy, as it applies to both coverage parts.  Exclusion A bars coverage

8   for "any Pollution Event known to any Insured's principal, partner, director, officer or employee

9   with responsibility for environmental affairs . . . ."  Miller Decl., Ex. 1 at P. 16 (Exclusion IV.A).

10  There is no doubt that responsible employees of insureds The Presidio Trust and NPS—and their

11  partner, GGNPA—knew about the contamination entering into the Lake well before the policy

12  began.  *Supra*, Section II.A and III.B.1.a.  Indeed, the pollution event at Mountain Lake was

13  specifically endorsed onto the RSL Policy and specifically excluded from the REEL Policy by

14  Table 1.[17]  Miller Decl., Ex. 1 at P. 41 (Endorsement 3, Table 1 ("Known Pollution Events Listed

15  in Table 1 Endorsement")).  In addition, as noted above, specific individuals responsible for

16  environmental affairs at The Presidio Trust—such as its Environmental Remediation Manager—

17  were aware no later than 1998 of lead pollution in the Mountain Lake sediment.  *Id.*, Ex. 21.  And

18  even if only one of the three entities (The Trust, NPS or GGNPA) knew of the contamination,

19  coverage is barred, as the exclusion applies to knowledge by "any" insured.  *Id.*, Ex. 1 at P. 16-19

20  (Exclusions).  Exclusion A bars REEL coverage.

21             Endorsement 3 to the REEL Policy is consistent.  It precludes coverage for the ***known***

22  ***pollution events*** identified in Exhibit 2 to the MOA that are included in Table 1.  Mountain Lake

23  is included in both the MOA (Miller Decl., Ex. 10 at JAB 00561-62 – JAB 00871-72) and in

24  ───────────────
[16]  During the adjusting of this claim, Steadfast repeatedly asked The Trust to demonstrate that
25  a regulatory entity was requiring it to clean up Mountain Lake.  Oddly, The Trust repeatedly
    declined.  Yet just two months ago, after Steadfast was forced to move to compel, The Trust
26  produced not only its Consent Agreement with the DTSC, but ***drafts*** of this Agreement going
    back to early 1999.  *Id.*

27  [17]  In fact, the very costs sought in this litigation by The Trust are covered under an endorsement
    to the RSL Policy.  *See* Miller Decl., Ex. 2 at P. 62 (Endorsement 10); *see also* Section II.C.2,
28  *supra*, and Section III.B.2., *infra*.

SQUIRE, SANDERS &
DEMPSEY L.L.P.
275 Battery Street, Suite 2600
San Francisco, California  94111

STEADFAST'S NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT;
MEMORANDUM IN SUPPORT - Case No. CV08-5005-MMC

1    Table 1 (*id.*, Ex. 1 at P. 41).[18]

2          In short, it is difficult to fathom how The Trust can contend that it did not know of this

3    contamination before May 24, 1999.  Indeed, as set forth below, coverage for remediation of this

4    known pollution was the entire purpose of the RSL Policy.  And because coverage exists under

5    the RSL Policy, it cannot exist under the REEL Policy.  *See id.*, Ex. 1 at P. 39 (Endorsement 3

6    (last sentence)).  Because there is no REEL Policy coverage for Mountain Lake as a matter of

7    law, The Trust's Third Claim for Relief as to Mountain Lake should be summarily adjudicated in

8    Steadfast's favor.

9                     **2.      The Contamination at Mountain Lake is covered under the RSL
10                              Policy.**

11         Further evidence that the REEL Policy does not cover the claim is the fact that the RSL

12   Policy ***does*** cover it.[19]  The Mountain Lake site was listed on Table 1 to the RSL Policy when the

13   RSL Policy first began.  Miller Decl., Ex. 2 at P. 32.  Endorsement 3 to the REEL Policy makes

14   clear that pollution events identified in Exhibit 2 to the MOA and included in Table 1 are ***known***

15   to the insured and thus covered by the RSL.  *Id.*, Ex. 1 at P. 39.  Not only is Mountain Lake

16   identified in the MOA and Table 1, as set forth above, the MOA includes numerous reports and

17   RAB meeting transcripts identifying lead contamination in the lake sediments.  Miller Decl., ¶ 10

18   and Ex. 7.

19         The Trust has argued that because the Scope of Work in Table 1 to the RSL Policy does

20   not specifically mention remediation of lead in sediments but only mentions water monitoring,

21   the amended scope of work is not covered.  Nonsense.  ***As demanded by The Trust itself***,

22   coverage under the RSL Policy is not limited to the specific words appearing in the initial scope

23   of work endorsement.[20]  Furthermore, none of the hundreds of sites in Table 1 lists the particular

---

[18]  The MOA specifically references the 1998 "Report of Sediment Sampling" (JAB 00872), the RAB Transcripts (JAB 00562) and numerous other reports of lead contamination.

[19]  Of course, to disprove coverage under the REEL Policy, it is not necessary to ***establish*** coverage under the RSL Policy, but establishing the latter necessarily ***precludes*** coverage under the former.  *See id.*, Ex. 1 at P. 39 (Endorsement 3 (last sentence)).

[20]  This is consistent with the fact that Steadfast and The Trust also entered into fifteen (15) Scope of Work endorsements to the RSL Policy amending the remedy for sites that were initially contemplated on Table 1.  Miller Decl., Ex. 2 at P. 49, 59-79 (Endorsements Nos. 3, 8-21).

1    pollution involved.  Therefore, if The Trust's argument is allowed to stand, the RSL Policy would

2    cover none of the sites appended to it.  Of course, the amendment of the RSL Scope of Work

3    Endorsement for further required activity was an element of the RSL Policy that The Presidio

4    Trust requested during the policy negotiations.  *Id.*, ¶¶ 45-46 and Exs. 2, 49 and 51; Bir Decl.,

5    Ex. 1 at 1-2.  ***Indeed, the exception to Exclusion I of the RSL Policy makes clear that where***

6    ***a change in the Scope of Work for sites identified on Table 1 is required, it is covered under the***

7    ***RSL.***  Miller Decl., Ex. 2 at P. 16 (Exclusion IV.I).  Moreover, if the RSL provided coverage only

8    for the specific activity originally listed in the Scope of Work, Exclusion I would have been

9    unnecessary in the first instance.  Policies are to be interpreted as a whole and no terms may be

10   read out of the policy.  Cal. Civil Code § 1641; *Boghos v. Certain Underwriters at Lloyd's of*

11   *London*, 36 Cal. 4th 495, 503 (2005) ("disfavor[ing] constructions of contractual provisions that

12   would render other provisions surplusage"); Cal. Code of Civil Proc. § 1858 ("In the construction

13   of a statute or instrument, the office of the Judge is simply to ascertain and declare what is in

14   terms or in substance contained therein, not to insert what has been omitted, or to omit what has

15   been inserted . . .").

16       Here, The Trust claims that it has been required by a regulatory agency (*i.e.,* the DTSC) to

17   change the Scope of Work for Mountain Lake.  Miller Decl., Ex. 4 at 2-4, 15.  Therefore, the

18   change in the scope of work from site monitoring to preparation of a remedial action plan is

19   covered by the RSL Policy.[21]

20       A regulatory-required change in the Scope of Work for a given site is precisely the risk

21   assumed by Steadfast under the RSL ***cost overrun*** policy.  The Presidio Trust received

22   $99 million from the Army to pay for existing, known environmental liabilities because that was

23   the projected cost expenditure given the proposed environmental activities listed on Table 1.

24   Miller Decl., Ex. 22 at Section 4.2(a).  The RSL Policy insures against the possibility that the cost

25   to clean up known problems might ***exceed*** $100 million dollars.  *Id.*, Ex. 2 at P. 1 (Declarations).

26

---

[21]  Flexibility in the Scope of Work was an essential element negotiated by The Trust.  Miller

27   Decl., ¶¶ 44-47; Bir Decl., Ex. 1 at 1-2.  Indeed, during policy negotiation The Trust told Zurich
     that the RSL policy would cover ***all*** remedial activities at the Enumerated Sites (which include

28   Mountain Lake).  Miller Decl., ¶¶ 44-47.

SQUIRE, SANDERS &
DEMPSEY L.L.P.
275 Battery Street, Suite 2600
San Francisco, California  94111

STEADFAST'S NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT;
MEMORANDUM IN SUPPORT - Case No. CV08-5005-MMC

1    For example, during site investigation, it might be found that the site requires more than just

2    surface water monitoring, as is the case at Mountain Lake.  And in that scenario, the new remedy

3    for the old problem was to be covered by way of a Scope of Work endorsement.

4         And this is precisely what happened at Mountain Lake; the RSL Policy was endorsed in

5    2003 to cover an increased Scope of Work at Mountain Lake:

6        **THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE
         READ IT CAREFULLY.**

7

8    This endorsement modifies insurance provided by the following:

9    **Remediation Stop Loss Policy**

10   In consideration of the payment of the premium and the
     undertaking of the **Insured** to pay the **Cumulative Losses Self
     Insured Retention** and **Total Cumulative Losses Self Insured
     Retention** by the **Named Insured** and in reliance upon the

11   statement in the Application made a part hereof, the Company
     agrees with the **Insured**, subject to all the terms, exclusions and

12   conditions of the Policy that:

13   **1.  Scope of Work**

14   The following proposed activities are appended to Table 1 – Scope

15   of Work for the Insured Project:

16

| Site | Proposed Activity |
| --- | --- |
| Mountain Lake Area | Prepare a Remedial Action Plan (RAP) and remedial design consistent with the most likely regulatory agency-required remedy of contaminated sediment excavation, off-site disposal, relocation of surface water outfalls, and surface water monitoring. |

22   Miller Decl., Ex. 2 at P. 62 (Endorsement 10) (emphasis in original).  It is that—and ***only*** that—

23   activity that The Trust is currently required to undertake and that therefore could be covered

24   under this policy.

25         Now, in this case, The Presidio Trust reverses course and seeks to have the old lead

26   contamination, which The Trust absolutely knew about, covered under the REEL Policy because

27   it is financially more convenient to do so.  But there can be no question that the REEL Policy

28

1  does not apply, if only because the RSL does apply.

2  **IV.   CONCLUSION**

3       The costs that The Presidio Trust will be required to incur to clean up lead in Mountain

4  Lake will be borne by Steadfast under the RSL Policy, assuming The Trust reaches the $100

5  million attachment point before the policy expires.  If that point is not reached, The Trust still has

6  its action against the rightfully responsible entity—Caltrans.  The Trust cannot, however, "hedge

7  its bets" that it will not be able to recover from Caltrans or that it will not reach the $100 million

8  attachment point of the RSL Policy before it expires and force an immediate insurance payout by

9  transferring coverage of a known pollution event scheduled for coverage under the RSL to the

10  REEL.  The REEL Policy was never intended to, and does not, respond to known contamination

11  that both parties agreed would be covered under the RSL Policy.  As a matter of law, the REEL

12  Policy clearly and explicitly precludes coverage—in multiple provisions—for cleanup costs or

13  claims arising out of a Pollution Event known by an insured before May 24, 1999.  That is why

14  Mountain Lake was originally endorsed onto the RSL Policy and why The Trust specifically

15  asked Steadfast to amend the Scope of Work (through Endorsement 10) to include in the RSL the

16  precise activities coverage for which it now seeks under the REEL Policy.

17       As shown above, The Trust and the United States, both insureds under the REEL Policy,

18  were aware of the Pollution Event and the resulting contamination of Mountain Lake sediment

19  long before that date.  Thus, the declaratory relief claim sought by The Trust should be resolved

20  in Steadfast's favor.  Furthermore, without REEL coverage or a denial of RSL Policy benefits,

21  The Trust's breach of contract claim should also be summarily adjudicated in Steadfast's favor.

22  Steadfast respectfully requests that the Court do so.

23  Dated:  October 29, 2010                         Respectfully submitted,

24                                                   Squire, Sanders & Dempsey L.L.P.

25

26                                                   By:_____/s/  Ethan A. Miller_____
                                                             Ethan A. Miller
27                                                   Attorneys for Defendants and Counter-Claimant
                                                     ZURICH AMERICAN INSURANCE COMPANY
28                                                   and STEADFAST INSURANCE COMPANY

SQUIRE, SANDERS &
DEMPSEY L.L.P.
275 Battery Street, Suite 2600
San Francisco, California  94111