MELINDA HAAG (SBN 132612)
United States Attorney
JOANN M. SWANSON (SBN 88143)
Assistant United States Attorney
Chief, Civil Division
JONATHAN U. LEE (SBN 148792)
CHARLES O'CONNOR (SBN 56320)
Assistant United States Attorneys
Northern District of California

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102
    Telephone:    (415) 436-6909 (Lee)
    FAX:        (415) 436-7169

Attorneys for the UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>   v.<br><br>ZURICH INSURANCE COMPANY, ZURICH AMERICAN INSURANCE COMPANY and STEADFAST INSURANCE COMPANY,<br><br>        Defendant.<br><br>AND RELATED CROSS ACTION | Case No. 08-5005 MMC (EDL)<br><br>**OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Date:  December 10, 2010<br>Time:  9:00 a.m.<br>Courtroom:  E, 15th Floor, U.S. Courthouse<br>450 Golden Gate Ave., S.F., CA  94102 |

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................... 1

II.     PROCEDURAL HISTORY............................................. 2

III.    STATEMENT OF FACTS. ........................................... 2

        A.      The Trust's REEL Claim For Mt. Lake ("Mt. Lake"). ...................... 4

        B.      The Letterman Army Institute of Research ("LAIR") REEL Claim. ........... 5

        C.      The Richardson Slip Ramp REEL Claim. ............................... 6

        D.      The Merchant Road Fill Site REEL Claim. ............................. 7

        E.      The Baker Beach Disturbed Area 2A REEL Claim......................... 7

        F.      The Building 937 REEL Claim. ...................................... 9

IV.     DISCUSSION. ................................................... 10

        A.      Applicable Legal Principles.......................................... 10

        B.      Zurich Unreasonably Denied REEL Coverage For Mt. Lake
                Because There Was No Pollution Event Known Before
                The Policies Incepted.. ............................................ 12

                1.      The REEL Policy Defines "Pollution Event" in Terms of
                        "Irritant," "Contaminant," and "Pollutant," Which Are Not
                        Defined In The Policy and Therefore Should Be Given
                        Their Common, Ordinary Meaning. ............................ 12

                2.      During Course of Performance, Zurich Interpreted Pollution
                        Event To Mean The Presence of Constituents At Levels
                        Requiring Remedial Action. ................................. 13

        C.      As of Time Policies Incepted, There Was No Known Pollution Event
                at Mt. Lake Because Lead Was Not Known To Be Present At Levels
                Requiring Remediation Until After the Policies Incepted.................. 15

        D.      Zurich's Construction of Endorsement 3 to the REEL Policy Is
                Not Reasonable Because It Disregards The Language of the
                Endorsement, Makes Coverage Dependent on Establishing The
                Absence of a Constituent In Any Level, No Matter How Minute,
                In Exhibit 2 to the MOA, and It Contradicts Zurich's November 2006
                Letter to the Trust.. ............................................ 19

        E.      Zurich's Position Regarding RSL Coverage for Mt. Lake and
                Building 937 Contradicts Its Position In Other Correspondence
                That RSL Coverage Is Limited to the Schedule of Activities in
                The SOW and Allows Zurich to Nullify The Existence of the REEL
                Policy When It Chooses.......................................... 21

F.      Zurich's Long Overdue Concession of RSL Coverage for Mt. Lake
        Is Evidence of Its Breach of the Policies, and Does Not Preclude
        USA's Claim for REEL Coverage and Bad Faith Claim. . . . . . . . . . . . . . . . . . 22

V.      CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). . . . . . . . . . . . . . . . . . . . . . . . . 10

*Celotex Corp. v. Catrett*,
  477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). . . . . . . . . . . . . . . . . . . . . . . . 10

*T.W. Electric Serv., Inc. v. Pacific Electric Contractors Association*,
  809 F.2d 626 (9th Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Villiarimo v. Aloha Island Air, Inc.*,
  281 F.3d 1054 (9th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

## STATE CASES

*E.M.M.I., Inc. v. Zurich American Insurance Co.*,
  32 Cal. 4th 465, 9 Cal. Rptr. 3d 701, 84 P.3d 385 (2004). . . . . . . . . . . . . . . . . . . . . . . 11

*Employers Reinsurance Co. v. Superior Court*,
  161 Cal. App. 4th 906, 74 Cal. Rptr. 3d 733 (2008). . . . . . . . . . . . . . . . . . . . 11, 13, 15, 16

*Crane v. State Farm Fire & Casualty Co.*,
  5 Cal. 3d 112, 95 Cal. Rptr. 513, 485 P.2d 1129 (1971). . . . . . . . . . . . . . . . . . . . . . . 11, 12

*MacKinnon v. Truck Insurance Exch.*,
  31 Cal. 4th 635, 3 Cal. Rptr. 3d 228, 73 P.3d 1205 (2003). . . . . . . . . . . . . . . . . . . . . . . 11

*Palmer v. Truck Insurance Exch.*,
  21 Cal. 4th 1109, 90 Cal. Rptr. 2d 647, 988 P.2d 568 (1999). . . . . . . . . . . . . . . . . . . . . 11

*White v. Western Title Insurance Co.*,
  40 Cal. 3d 870, 221 Cal. Rptr. 509, 710 P.2d 309 (1985). . . . . . . . . . . . . . . . . . . . . . . . 11

## FEDERAL STATUTES

Fed.R.Civ.P. 56(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

## STATE STATUTES

Cal. Civ.Code § 1644.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12, 13

# I.    INTRODUCTION

Congress created the Presidio Trust in 1996 to manage what is now a national park, the Presidio of San Francisco.  The Trust is the lead agency responsible for remediation of the Presidio after nearly 150 years of Army activities on the site.  The Trust purchased two insurance policies in 1999 from Zurich[1] to support its clean up of the Presidio while also meeting its Congressional mandate to become financially self-sufficient within 15 years.  Zurich's promises in 1999 that it would be the Trust's partner in the clean up effort have evaporated.  In this action, the United States seeks to enforce those promises.

For the Trust's efforts, Zurich characterizes the Trust's motives as dishonest and greedy, based on Zurich's inaccurate re-writing of history between the parties.  Zurich's coverage theory is that, because the Trust disclosed thousands of documents describing environmental conditions at the Presidio to Zurich before Zurich agreed to insure the Trust, the Trust must now establish the complete absence of any mention in any of the documents of lead at Mt. Lake (or PCE at Building 937), before there can be REEL coverage.  This argument does not square with the plain wording of the policies, the ordinary meaning of the terms used in the policies, Zurich's own interpretation of "Pollution Event," or Zurich's conduct in regard to other REEL claims.

Zurich's denial of the Mt. Lake and Building 937 REEL claims has unreasonably deprived the Trust of policy benefits, as have other decisions by Zurich explained herein.  Some of these facts have only come to light after protracted discovery disputes resulted in the Court ordering Zurich to comply with its discovery obligations and disclose internal Zurich documents  that undermine its motion arguments.  In addition, Zurich's motion represents a shift in its position that Mt. Lake is covered under its RSL policy; Zurich determined this position in 2001-2002 but

---

[1] For simplicity, plaintiff will refer to defendants as "Zurich" as defendants referred to themselves in numerous letters and other documents during the past 15 years.

maintained publicly, until filing this motion, that the Trust could not show it was required to clean up the site, so RSL coverage was wanting.  Zurich's motion should be denied.

## II.        PROCEDURAL HISTORY

The United States filed its complaint on November 4, 2008, alleging in part breach of the REEL and RSL policies from Zurich's denial of its Mt. Lake and Building 937 REEL claims. ¶¶ 26-30.  The complaint also alleges insurance bad faith for Zurich's unreasonable claims handling practices, failure of prompt and fair payments of claims, and engaging in a pattern of misconduct going beyond the Mt. Lake claim. ¶¶ 31-36.  Zurich then filed a counterclaim against the Presidio Trust.  Dkt. 17.  Trial is set for February 28, 2011.

## III.       STATEMENT OF FACTS

In September 1998, Zurich first contacted the Trust about providing its environmental insurance.  USA-2 (enclosing documents including USA-1), USA-3 (noting "voluminous supporting documentation" will need to be reviewed), and USA-4 (discussing drafting of proposal).[2]  That month, Zurich sent a team of four underwriters to spend three days in San Francisco reviewing documents at the Presidio identified on a "master bibliography list." USA-5, 6, and 7.  In October 1998, Zurich made a written insurance proposal, after an "intense technical underwriting effort" and providing a hypothetical case study involving "Redevelopment of the Letterman Complex" in which the REEL and the RSL respond simultaneously. USA-9 at 5 and Appendix A.  Zurich's October 1998 proposal included promises of "partnership" (USA-10 at 4) and REEL coverage for "unknown historical contamination," "re-opened remediated conditions," and "discovery of additional contamination" (*Id.* at 7, 8).  One Zurich attendee noted "[o]ur tone was one of [Zurich] and the client working in partnership…" USA-11 at 1.

In January 1999, Zurich received a copy of Exhibit 2 to the draft Presidio MOA (Exhibit 2).

---

[2] References to "USA-#" are to exhibits appended to the Declaration of Jonathan U. Lee.

USA-13 at 1-2.  Exhibit 2 was a list of documents several hundred pages long.  Lee Dec. ¶26.  The listed documents were technical reports and other writings relating to environmental conditions at the Presidio, grouped by site name. USA-24, 25.  Erler & Kalinowski's (EKI) November 1998 Report of Sediment Sampling at Mt. Lake and May 1998 Alternative Remedies document were part of Exhibit 2, and Zurich had access to Exhibit 2 during the underwriting of the policies. USA-13. In its applications for the REEL and RSL policies, the Presidio Trust informed Zurich that the documents in the "BRAC Library" described environmental conditions at the Presidio.  USA-19 (REEL app. at 1; RSL app. at 1).  Zurich had access to the BRAC Library during its underwriting of the policies. USA-114 at 179:14-21.  By May 20, 1999, Zurich invested more than "150 man hours in technical due diligence" to understand and evaluate environmental conditions at the Presidio. USA-18 at 2, USA-115 at 90:8-93:9 (Underwriter: review informed opinion of the risks involved).

The two policies are the Real Estate Environmental Liability Insurance Policy ("REEL Policy") and the Remediation Stop-Loss Insurance Policy ("RSL Policy"). USA-21, 22.  They were Zurich's first military base closure policies. USA-98, 116 at 94-95.  The Trust paid $5,961,250 and $807,000 in premium for the RSL and REEL, respectively. USA-21, 22, USA-104 at 1.  The RSL's Scope of Work ("SOW") Endorsement 2 lists Mt. Lake Area for this Proposed Activity:  "Monitor surface water and perform biological verification sampling." USA-22, p. 33.  Zurich evaluated Mt. Lake as a risk, during underwriting, and determined the site did not require remediation, according to internal documents produced after a motion to compel. USA-33 at 2 ("Based on information available at the time of underwriting, it was believed the necessary SOW to complete remediation of Mt. Lake would be limited to administrative activities and sampling.").  Zurich's consultants called Mt. Lake a "low priority" site at which the proposed activity would cost approximately $200,000. *See* USA-14, 15, 16 and 102.  The SOW lists Building 937 for:  "Obtain NFA certification from regulatory agencies" for soil and "monitor groundwater." USA-22, p. 45.

By late 1999, the Trust submitted the first of its quarterly reports of costs for activities listed in the RSL's SOW.  According to internal Zurich documents, Zurich prepared for this first quarterly report by preparing an internal memo. USA-27.  According to the memo, the Trust is the "lead cleanup agency" at the Presidio and the Trust had entered into a Consent Agreement in August 1999 with the California Department of Toxic Substances Control (DTSC) for remediation of the Presidio.  *Id*. at 1.  Under a heading "Regulatory Requirements" on page 3, this internal memo confirmed that "The substance of this agreement with DTSC is an obligation on the part of the Trust to affect cleanup according to a negotiated schedule, consistent with applicable environmental laws." *Id*. at 3.

Zurich provided written responses to the Trust's quarterly letters.  "[I]n most quarters," according to its claims adjuster, Zurich's letters decline to accept some of the costs submitted by the Trust as not reasonable or necessary costs to complete the RSL's SOW. USA-110 at 153:16-21. Zurich's letters state:  "As you know, to be covered under the [RSL] policy, the costs incurred by the Presidio Trust must be for tasks required to complete the activities and schedule outlined in the Scope of Work Endorsement."  *See, e.g.,* USA-82 to USA-96 (2000-2005 letters), USA-45 (2010 letter).

A.    **The Trust's REEL Claim For Mt. Lake ("Mt. Lake")**

The Trust provided notice of a potential REEL claim on August 8, 2001. USA-30.  At page 3, the notice discussed the Consent Agreement.  Zurich denied this claim on December 21, 2001. USA-34.  Zurich's letter discussed the Consent Agreement and DTSC's letter dated September 28, 2001, which stated:  "The supplemental investigation conducted in 2001 detected lead in sediments at concentrations as high as 2000 mg/kg …DTSC has determined that contaminants within Mt. Lake sediments represent a hazard to human health and the environment." USA-31.  DTSC issued a second letter dated February 27, 2002.  USA-35.

4

In December 2002, the Trust requested a modification to the RSL's SOW regarding Mt. Lake.  USA-36.  This request was "without prejudice" to the Trust's REEL claim for the site. *Id.* Zurich issued the requested endorsement, which was signed June 11, 2003. USA-22.

On January 6, 2006, the Trust sent another letter to Zurich about the Mt. Lake REEL claim. USA-36.  This letter also referred Zurich to the Consent Agreement and DTSC's letters.  Zurich responded with its denial letter dated November 7, 2006.  USA-40.

The Trust requested reconsideration of Zurich's coverage denial, again citing the Consent Order.  Zurich responded by confirming its denial of REEL coverage in letters dated February 14, 2008, April 11, 2008, and August 4, 2008.  USA-42, 43 & 44.  In addition to denying REEL coverage, these letters informed the Trust that it did not have RSL coverage for Mt. Lake because it had not demonstrated it had a legal obligation to remediate the site.  *See, e.g.,* USA-44 at 1-4.

According to internal Zurich documents produced in discovery, Zurich determined Mt. Lake was covered under the RSL years ago.  See, e.g., USA-28 (9/11/02 entry "…our position that it is in RSL Policy"), USA-101 (12/12/02 memo: "Zurich has determined…[claim is] covered under the [RSL]").

**B.      The Letterman Army Institute of Research ("LAIR") REEL Claim**

The LAIR site was the subject of a REEL claim made in November 2004, relating to work at the site performed in 2002.  USA-50.  The claim was for excavation and disposal of soil in connection with the project to build the Letterman Digital Art Center.  USA-51 at 1.  Soil excavation and disposal was complete by May 2002.  USA-48 at App. F "Soil Disposal Documentation."  DTSC provided a "no further action" letter dated November 4, 2002. USA-51 at 1.  LAIR was within the boundary of Letterman Complex, a site on the RSL's SOW listed for remediation of soil with lead based paint. USA-51 at 3.  Zurich added a SOW endorsement to the RSL regarding LAIR on May 14, 2003.  USA-22 (End. #10).  Under the terms of the endorsement,

there was RSL coverage for soil sampling, analysis and reporting at LAIR up to $35,000, but cleanup costs for "previously unknown contamination" were not included in the SOW. *Id.*

By letter dated July 17, 2006, Zurich accepted the LAIR claim as covered under the REEL. USA-52. Zurich identified four "pollution events" in the letter. *Id.* Each pollution event was "previously detected in this area, <u>but not at concentrations requiring remedial action</u>." *Id.* (emphasis added). Zurich's claims notes confirm LAIR was covered location in RSL's SOW but REEL coverage was appropriate because work to clean up the four pollution events was outside the SOW. USA-47 (7/20/06 entry). Zurich's current claims handler testified the four pollution events were previously detected at LAIR. USA-110 at 175:18-179:11. Zurich's former claims handler remembered virtually nothing about her July 17, 2006 letter. USA-111 at 195-199.

Zurich used a 2002 Harding ESE report to adjust the LAIR claim. USA-112 at 153:21. The report identified a 1995 investigation that detected petroleum (one of the four pollution events) at LAIR. USA-48 at 3, "Prior Non-CERCLA Site Investigations," noting 1994-1995 detection of 1,2,4 trimethylbenzene; USA-118 at 221-223 (confirming it is gasoline, i.e., petroleum).

## C. The Richardson Slip Ramp REEL Claim

In January 2005, the Trust made a REEL claim for the Richardson Slip Ramp site, again for excavation and removal of contaminated soil. USA-53 (4/20/05 entry), 54. Richardson Slip Ramp was located within the boundary of Letterman Complex, a site on the RSL's SOW for remediation of lead based paint in soil. USA-53 (7/10/06 entry), USA-55 at 1-2. The Trust's REEL claim at the site concerned excavation and removal of soil contaminated by lead. *Id.* Zurich was unable to verify the claim by forensic analysis of the soil, which had been disposed of in 2004, or to determine a source of the lead. USA-55 at 2. There was no letter or other documentation of a specific requirement by DTSC regarding this work. USA-112 at 109:14-114:4, see also 159:23-168:10. In July 2006, Zurich paid this claim "in full." USA-56.

**D.     The Merchant Road Fill Site REEL Claim**

In March 2007, the Trust made a REEL claim for the Merchant Road site. USA-58 at 1. The claim concerned "arsenic exceedances." USA-57 (4/26/07 entry).  In internal documents only disclosed in this litigation, Zurich's consultant informed Zurich:  "the analysis of soils collected from the filled area suggests that <u>cleanup levels may not be exceeded</u> and remediation may not be required.  <u>As such a release of pollutants may not have occurred</u>." USA-59 at 2 (emphasis added). In its internal file notes, Zurich's claims handler wrote:  "…<u>arsenic is below actionable levels, and therefore is not a pollution event.</u>" USA-57 (8/19/08 entry) (emphasis added).  In an email to others at Zurich, the claims handler reiterated:  "…<u>arsenic levels are below action levels, therefore, at this time there is no pollution event and no coverage</u>…"  USA-60 (emphasis added).  In its October 22, 2008 letter to the Trust denying this REEL claim, Zurich noted that 2006 and 2007 reports confirmed arsenic was not present at concentrations requiring remediation of the site, before noting "it appears as though there has not been a "Pollution Event" at the Merchant Road.  USA-61 at 3.

**E.     The Baker Beach Disturbed Area 2A REEL Claim**

The total costs to date incurred by the Trust is $5,585,240.04 (as of 9/30/10). Ancheta Decl. ¶ 3-4.  Work at the site has not been completed. *Id.*

On July 9, 2004, the Trust notified Zurich of a REEL claim at a site called Baker Beach 2A. USA-63 at 1, 64 at 1.  Zurich responded by letter dated October 10, 2005 denying this REEL claim on that ground that it was an unknown site for which the Trust had not contractually accepted responsibility through either the Consent Agreement or the MOA. USA-65 at 1, USA-117 at 51:2-52:3, 68:21-70:1.  In a letter dated November 10, 2006 clarifying its position, Zurich discussed the Consent Agreement, the MOA and the policies. USA-65.  With respect to Endorsement 3 to the REEL, Zurich stated:  "Endorsement 3 has a single purpose: to identify which of the universe of known "Pollution Events" listed in Exhibit 2 would be deemed known (and therefore excluded from

*United States v. Zurich Insurance Co., et al.*
U.S. District Court Action 08-5005 MMC

coverage by Exclusion A to the REEL Policy) and which of the universe of known "Pollution Events" listed in Exhibit 2 would be deemed unknown (and therefore not excluded from coverage by Exclusion A to the REEL Policy).   Endorsement 3 has no other purpose or contractual intent." *Id*. at p. 4.

By letter dated May 14, 2007, Zurich reversed itself and notified the Trust that its Baker Beach 2A claim was covered under the REEL Policy.  USA-67.  Zurich provided this letter before the remedial action plan was finalized for the site.  USA-66.  Zurich's internal documents show it approved payment authority of $3.9 million in August 2007. USA-62 (8/28/07 entry).  Zurich's payments were for $399,211.22 in November 2007, $1,464,236.02 in September 2008, $474,883.01 in January 2009, $88,797.54 in February 2009, $241,163.81 in October 2009, and $549,671.94 in February 2010.  Zurich's payments total $3,217,963.54. Ancheta ¶ 6.

The Trust pursued a claim against the Army for this site.  Zurich knew about the Trust's efforts to recover from the Army as early as June 4, 2007.  USA-68 at 2.  In a July 6, 2007 letter Zurich promised it would "promptly" reimburse the Trust for cleanup expenses at this site.  USA-69 at 2.  Zurich's consultant described the site as a "previously unknown pollution condition" in an August 2007 memo.  USA-70.

Zurich "encouraged" The Trust to pursue the Army for reimbursement on this site.  USA-113 at 273:25-275:5.  Correspondence and emails from 2007 confirm this testimony.  USA-71, 72. Zurich's claims adjuster reiterated its reservation of "rights under the subrogation provisions" of the REEL.  USA-72 (Beshara 9/5/07 email). The Trust was successful in recovering $2.3 million from the Army in June 2008.  Ancheta ¶ 5.  Zurich deducted that amount from its payments to the Trust, ignoring the subrogation provision of the REEL, and the Trust requested immediate payment. USA-73 at 4.  Zurich refused to reconsider its withholding of this sum.  USA-74 at 3-4.

To date, there are remediation costs at this covered site in the amount of $2.3 million that the Trust has not received from Zurich. Ancheta ¶ 7.

**F.      The Building 937 REEL Claim**

In February 2006, the Trust made a REEL potential claim for PCE in soil vapor at this site. USA-77.  The Trust made a claim against the Army that same month for the same issue. USA-78 (Catts Memo at 1).  The Army responded that the presence of PCE at that site would be reasonably expected due to the use of the site by the Army historically. USA-78 (Army letter).  On November 2, 2006, the Trust provided a further description of its claim to Zurich and a statement of costs incurred to date of $149,610.17. USA-78 (Catts Memo at 1).

One year later, Zurich denied the Trust's REEL claim by letter dated November 13, 2007, stating its position that "any remediation work required by the DTSC to address PCE is recoverable under the RSL Policy, not the REEL Policy…Accordingly, Steadfast hereby disclaims coverage for this claim under the REEL Policy.  In addition, Steadfast affirms coverage for this claim under the RSL Policy."  USA-80 at 4.  Zurich based its denial on the existence of historical records showing PCE had been detected in low levels not requiring remediation in 3 samples out of more than 1,100 taken in the 1990s. *Id.*; USA-79.  The Trust provided this information to Zurich on September 21, 2007.  Andersen Dec. ¶¶ 2-4.  The information was part of the publicly available record in the Presidio Library and Exhibit 2 to the MOA.  *Id*.

Building 937 is in the Crissy Field area.  The Crissy Field RAP was signed before the REEL policy incepted.  There was no cleanup level for PCE set forth in the Crissy Field RAP.  USA-75; USA-113 at 265:5-9 (no PCE, only breakdown products).

By letter dated February 15, 2008, the Trust asked Zurich to reconsider its REEL denial. Zurich confirmed its coverage position, denying REEL coverage but affirming RSL coverage, by letter dated August 7, 2008.  USA-81.

1   According to internal documents produced only after a motion to compel was granted,

2   Zurich determined sometime in 2006-2007 that there <u>was</u> REEL coverage for Building 937.  First,

3   in an undated typewritten document apparently written after November 7, 2006, with respect to

4   Building 937, Zurich said "PCE not previously known; approved for coverage under REEL

5   policy…"  USA-78.  Second, in a memo dated August 16, 2007, Zurich's consultant Mr. Catts

6   discussed the claim and concluded "…PCE and other VOCs in soil vapor and indoor air were not

7   known at policy inception, and are not part of the RSL Policy Scope of Work, and therefore

8   constitute a previously unknown pollution event."  USA-78.

9                                    **IV.    DISCUSSION**

10      **A.    Applicable Legal Principles**

11          Summary judgment is proper when the pleadings, discovery and affidavits show that there is

12  "no genuine issue as to any material fact and that the moving party is entitled to judgment as a

13  matter of law." Fed.R.Civ.P. 56(c).  Material facts are those which may affect the outcome of the

14  case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

15  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to

16  return a verdict for the nonmoving party. *Id.*  The moving party for summary judgment bears the

17  burden of identifying those portions of the pleadings, discovery and affidavits that demonstrate the

18  absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct.

19  2548, 91 L.Ed.2d 265 (1986).  Once the moving party meets its initial burden, the nonmoving party

20  must go beyond the pleadings and, by its own affidavits or discovery, "set forth specific facts

21  showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).  All reasonable inferences

22  supported by the evidence are to be drawn in favor of the nonmoving party. *See Villiarimo v. Aloha*

23  *Island Air, Inc.,* 281 F.3d 1054, 1061 (9th Cir. 2002).  The court does not make credibility

24  determinations, for "the weighing of evidence, and the drawing of legitimate inferences from the

facts are jury functions, not those of a judge." *Liberty Lobby,* 477 U.S. at 249, 106 S.Ct. 2505.  "[I]f a rational trier of fact might resolve the issues in favor of the nonmoving party, summary judgment must be denied." *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 631 (9th Cir. 1987).

To interpret the meaning of an insurance policy, courts first look at the written provisions of the policy. "If the policy language is clear and explicit, it governs.... When interpreting a policy provision, we must give its terms their ordinary and popular sense, unless used by the parties in a technical sense or a special meaning is given to them by usage." *Palmer v. Truck Ins. Exch.,* 21 Cal.4th 1109, 1115, 90 Cal.Rptr.2d 647, 988 P.2d 568 (1999) (citations omitted).  In undertaking this analysis, courts must read limitations on coverage narrowly and insuring agreements "broadly so as to afford the greatest possible protection to the insured." *MacKinnon v. Truck Ins. Exch.,* 31 Cal.4th 635, 648, 3 Cal.Rptr.3d 228, 73 P.3d 1205 (2003) (quoting *White v. Western Title Ins. Co.,* 40 Cal.3d 870, 881, 221 Cal.Rptr. 509, 710 P.2d 309 (1985)).  An insurer cannot escape its basic duty to insure by means of an exclusionary clause that is unclear; any exception to the performance of the basic underlying obligation must be so stated as clearly to apprise the insured of its effect. *MacKinnon,* 31 Cal.4th at 648.

A policy provision is ambiguous if it is susceptible to two or more reasonable constructions. *E.M.M.I., Inc. v. Zurich American Ins. Co.,* 32 Cal.4th 465, 470, 9 Cal.Rptr.3d 701, 84 P.3d 385 (2004).  Any ambiguous terms are interpreted in favor of finding coverage, consistent with the insured's reasonable expectations. *Id.*  Policy language must be interpreted as a reasonable lay person would read it, not as it might be analyzed by an attorney or insurance professional. *Id.; see also Crane v. State Farm Fire & Casualty Co.,* 5 Cal.3d 112, 115, 95 Cal.Rptr. 513, 485 P.2d 1129 (1971). "[W]ords ... are to be understood in their ordinary and popular sense, rather than according to their strict legal meaning" unless used by the parties in that sense. Cal. Civ.Code § 1644.  An

insurer's or insured's interpretation of a policy provision during the course of performance is considered "the most reliable evidence of the parties' intentions." *Employers Reinsurance Co. v. Superior Court*, 161 Cal.App.4th 906, 921, 74 Cal.Rptr.3d 733, 745 (2008) (citations omitted).

> **B.      Zurich Unreasonably Denied REEL Coverage For Mt. Lake Because There Was No Pollution Event Known Before The Policies Incepted.**

Zurich claims that the Trust cannot establish as a matter of law that its Mt. Lake claim is covered by the REEL Policy because (1) the Trust knew of the relevant Pollution Event before the REEL Policy Period and (2) DTSC first made a Claim against the Trust related to this Pollution Event before the Policy Period.  Because neither of those statements is true, the Trust disputes both.[3]

> **1.      The REEL Policy Defines "Pollution Event" in Terms of "Irritant," "Contaminant," and "Pollutant," Which Are Not Defined In The Policy and Therefore Should Be Given Their Common, Ordinary Meaning**

The REEL Policy defines "Pollution Event" as "the discharge, dispersal, release, or escape of any . . . irritant, contaminant or pollutant . . ."  The REEL Policy does not define "irritant, contaminant or pollutant.[4]"

As noted in Zurich's motion, where words in a contract (such as an insurance policy) are not defined in the contract, they are to be given their ordinary, popular meaning, unless a technical or special meaning is suggested by their usage.  *See Crane v. State Farm Fire & Casualty Co.,* 5 Cal.3d 112, 115 (1971).  "[W]ords ... are to be understood in their ordinary and popular sense, rather than according to their strict legal meaning" unless used by the parties in that sense. Cal. Civ.Code § 1644.

---

[3] Zurich has known the Trust's facts, witnesses and documents for over a year. USA-123.

[4] Zurich's cases don't apply because Zurich relies on boilerplate, not negotiated, language in the Pollution Event definition. Compare REEL (USA 22 at 16) with Form REEL provided in October 1998 (USA-9 at 46).

The common or ordinary meanings of "irritant," "contaminant," and "pollutant" all include the idea that a substance be unclean or harmful in some way.  "Irritant" means "causing irritation." USA-124.  The definition of "irritation," in turn, includes: "A condition of inflammation, soreness, or irritability of a bodily organ or part."  *Id.*  "Contaminant" is "one that contaminates."  *Id.* "Contaminate," in turn, means "To make impure or unclean by contact or mixture."  *Id.*  Finally, "pollutant" is "a substance that pollutes."  *Id.*  "Pollute," in turn, means "To make unfit for or harmful to living things, especially by the addition of waste matter."  *Id.*  A common technical definition of "pollutant" is, perhaps, more relevant to the instant matter.  It defines "pollutant" as:

> *A substance or condition that contaminates air, water, or soil.  Pollutants can be artificial substances, such as pesticides and PCBs, or naturally occurring substances, such as oil or carbon dioxide, that occur in harmful concentrations in a given environment.*

USA-124.

Based on these common meanings, there is no ambiguity as to the meaning of "Pollution Event":  if the discharge, dispersal, release or escape of a substance does not cause inflammation, or make something unclean, or is not harmful, than it is not a Pollution Event.  Lead, a naturally occurring substance, only becomes a Pollution Event when released in "harmful concentrations in a given environment."  *Id.*  Because the known levels of lead in Mt. Lake before May 24, 1999 were not harmful (i.e., did not require cleaning up), there was no known Pollution Event.  The same is true for the PCE levels at Bldg. 937.  USA-78 (Catts Memo at 5)..

As discussed below, this is consistent with Zurich's own understanding of the term "Pollution Event," as revealed by its claims handling conduct.

### 2.    During Course of Performance, Zurich Interpreted Pollution Event To Mean The Presence of Constituents At Levels Requiring Remedial Action

How Zurich interpreted the REEL and RSL policies during the course of performance of its duties, before this litigation, is considered "the most reliable evidence of the parties' intentions." *Employers Reinsurance Co. v. Superior Court*, 161 Cal.App.4th 906, 921, 74 Cal.Rptr.3d 733,

13

745 (2008).  Internal documents produced in the litigation reveal that Zurich defined "Pollution Event" as the presence of a substance at concentrations requiring cleanup.

In July 2006, Zurich accepted the LAIR claim as covered under the REEL Policy, even though petroleum and chlordane were previously known to exist at this site.  Zurich found four pollution events at LAIR, noting the substances were not previously detected at levels requiring cleanup.  The claims notes describe the July 2006 letter as a "complete eval" of this claim.

That same month, Zurich informed the Trust it would cover the Richardson Slip Ramp claim under the REEL policy.  Richardson Slip, like LAIR, was within the boundary of a RSL site, listed for remediation of lead in soil.  The source of the lead was unknown and Zurich never demanded a specific letter from DTSC about the soil remediation.  Even though the RSL's SOW included lead (same metal at the same area), Zurich paid this REEL claim.  In order to do so, Zurich had to determine lead in the soil was a "Pollution Event."

In August 2007, in a secret memo produced only after a motion to compel, Zurich's consultant determined that the "Pollution Event" at Building 937 was soil vapor and indoor air with PCE, even though Zurich had previously learned the Army's position that PCE could be expected to exist at Building 937 due to the previous Army uses of the building.

In August 2008, Zurich denied REEL coverage for Merchant Road because arsenic was not present at the site in levels requiring remediation.  Internal communications and claims notes confirmed Zurich's interpretation of Pollution Event to be actionable levels.[5]

From this body of evidence, which must be construed in plaintiff's favor, a reasonable jury could determine that Zurich's current position is a pretext to deny coverage and that if instead Zurich had simply applied the same interpretation of Pollution Event in the case of Mt. Lake and

---

[5] *See also* USA-46 at 2 ("RSL policy only covers remediation activities necessary to clean up lead (or other contaminants) above actionable levels.").

14

1   Building 937 that it applied in other claims, it would have accepted coverage under the REEL as of

2   2006.

3          **C.**    **As of Time Policies Incepted, There Was No Known Pollution Event at Mt.**

4                 **Lake Because Lead Was Not Known To Be Present At Levels Requiring Remediation Until After the Policies Incepted.**

5         The evidence overwhelmingly shows there was no planned remediation of lead in sediments

6   at Mt. Lake at the time of the policies incepted in May 1999.

7         First, Zurich's internal documents confirm that at the time the policies incepted, the

8   "necessary SOW to complete remediation at Mt. Lake would be limited to administrative activities

9   and sampling." USA-33.  This internal document goes on:  "New information developed

10  subsequent to binding coverage indicates that the extent and concentration of contamination is

11  greater than originally anticipated and that more extensive active remediation may be required to

12  complete closure of this site."  This document was never provided to the Trust until the Court

13  ordered Zurich to provide it.  Another secret internal document from 2001, turned over only after a

14  Court order in this case, reached the same conclusions. USA-32.  The Army's investigation found

15  "low concentrations" of several chemicals of concern and "no remedial action was planned", but

16  after the policies incepted, investigations by UC-Berkeley students found higher concentrations.  *Id.*

17  2-3.[6]

18        Second, the Trust disclosed its knowledge of low levels of lead in Mt. Lake sediments to

19  Zurich.  In September 1998, the Trust through its broker Marsh made background documents

20  available to Zurich to help it analyze the environmental risk at the Presidio. USA-5, 6, and 7.  In

21  January 1999, the Trust through Marsh provided Zurich with a copy of Exhibit 2, the lengthy list of

22  documents about the conditions at the Presidio. USA-13.  Before May 1999, when the policies

23  began, the Trust provided Zurich with access to the library of those documents. Id., USA-122

                        15

(RFAs #14-16).  Zurich's underwriters described it as an "astronomical" amount of information.

USA-115 at 46:15-49:25. The underwriter testified he reviewed the data to "translate that into costs

to correct the environmental issues related to the property." *Id*. 46:20-47:3.  Zurich's documents

describe the information as "literally hundreds of volumes of site characterization reports." USA-27

at 1.  Zurich reviewed the EKI reports describing alternative remedial actions at the Presidio and

sediment sampling at Mt. Lake.  USA-121, 122 (RFAs 14-16); USA-24 (Exh. 2 list, p. JAB00872,

fifth entry).  The Trust's applications for the RSL and REEL policies pointed Zurich to the

hundreds of reports and other documents describing conditions at the Presidio, including Mt. Lake.

USA-19.  Zurich analyzed this and concluded Mt. Lake would not need remediation, only sampling

at a cost of $200,000.  *See, e.g.,* USA-102 at 2, "Low Priority" includes Mt. Lake for $187,000.

Zurich had access to all the information it needed to determine lead in sediments needed to be

remediated at Mt. Lake, and if it needed more information Zurich could have requested testing, but

the evidence establishes that Zurich instead concluded the only activities needed at the site were

"sampling of surface water and biota." USA-29 at 1, see also USA-32 ("low concentrations… no

remedial action was planned") and USA-33 ("limited to administrative activities and sampling").

Zurich cannot now claim that the Trust knew but did not disclose the presence of lead at Mt. Lake,

using historical documentation provided by the Trust so Zurich could determine the risk it was

willing to accept in the RSL and REEL policies.

      Third, Zurich's argument that others knew about lead pollution at Mt. Lake fails.  The

National Park Service's remediation manager Brian Ullensvang testified at deposition, repeatedly,

that the data did not show lead contamination or pollution at Mt. Lake before 2000.  USA-109 at

pp. 35-42, 46-49, 67-73, 85-95, 110-110, 177-193, 236-243, and 257-263.  The National Park

---

(footnote continued from previous page)
    [6] The UC Berkeley professor confirmed at deposition that his data was unknown to anyone
(continued on next page)

*United States v. Zurich Insurance Co., et al.*
U.S. District Court Action 08-5005 MMC

Service is an additional insured under the REEL Policy, and Zurich erroneously bases its motion on Exclusion A, which states in part that the knowledge of any insured of a pollution event defeats coverage unless there is disclosure and an endorsement.

Zurich's Exclusion A argument fails for several reasons.  First, the lead known by all parties, including Zurich, to exist at Mt. Lake was not a pollution event, using the definition Zurich used in other claims.  Second, the conditions at Mt. Lake were disclosed to Zurich, through the disclosure of the EKI Report of Sediment Sampling and other documents in Exhibit 2, and Zurich then added Endorsement 3 to the REEL confirming coverage for unknown pollution events in Exhibit 2.  Again using Zurich's definition of pollution event from its other REEL claims determinations, Endorsement 3 confirms coverage for those conditions disclosed in Exhibit 2 that subsequently are discovered to be actionable.  Thus, Endorsement 3 modifies Exclusion A by deeming conditions in Exhibit 2 to be unknown if they are not actionable.  This is what Zurich told the Trust Endorsement 3 meant, by letter dated November 7, 2006, which was within a few days of Zurich's denial of the Mt. Lake claim. USA-65.  Finally, Zurich's Exclusion A argument is at odds with the Separation of Insureds Provision of the REEL Policy, which states in pertinent part: "Except with respect to the deductible, Limit of Liability and any rights and duties specifically assigned to the First Named Insured this insurance applies:  as if each Named Insured were the only Named Insured….Misrepresentation, concealment, breach of condition or violation of any duty under this Policy by one Insured shall not prejudice the interest of coverage for another Insured under this Policy."  USA-21 at 33 (Condition I).

Zurich's "partner" argument based on Exclusion A is also incorrect.  Zurich focuses its argument on an email written by an NPS employee on January 8, 1999 to a GGNPA employee and

_____

(footnote continued from previous page)
before May 2000.  USA-119 at 58, 61-64, 83-85.

another NPS employee. Motion at 10. The email, which does not mention Mt. Lake, responds to another email forwarding preliminary results (which are not included with the email and which have not been revealed in this litigation). The author of the first email (who was apparently responsible for the results) indicated that her data had to be taken with a grain of salt and that the data likely was going to change. The final results (if any) are not known. Such unsubstantiated results, questioned by their very author, do not provide evidence of a Pollution Event. Nonetheless, Zurich argues that this email indicates that the GGNPA, one of the Trust's "partners" knew of a Pollution Event before the policy period. This is incorrect for several reasons (putting aside the fact that there was no Pollution Event).

First, the GGNPA is not a "partner" of the Trust for purposes of coverage under the policies.[7] The Golden Gate National Parks Conservancy, previously known as the Golden Gate National Parks Association ("GGNPA"), is a non-profit, non-governmental organization. It is not a federal agency, nor is it an insured under either the RSL or the REEL policies. It is patently unreasonable for Zurich to argue that the GGNPA's knowledge is imputable to the Presidio Trust for purposes of determining the Trust's coverage under these policies.

Second, there is no evidence that anyone at the GGNPA knew at the time the extent of lead contamination in Mt. Lake. As the deposition of Greg Archbald (a retired GGNPA employee) confirmed, the GGNPA did not understand that there was lead in Mt. Lake sediments requiring any remedial action:

> Q.      Okay. So you -- at no point before you retired were you aware that lead may have been running off from Park Presidio Boulevard into the lake?

---

[7] The REEL Policy's definition of Insured includes "any current or former trustee, principal, partner, executive, officer, director, employee . . . while acting within the scope of their employment or written agreement with the Insured." Similarly, Exclusion A is relevant to an Insured's "principal, partner, director, officer, or employee with responsibility for environmental affairs . . ." To the extent the GGNPA could be considered to be a "partner" of the Trust, clearly it is not the kind of partner contemplated by the REEL Policy.

1    A.      I have heard that, but I don't know what the timing was. There is --
there is -- I think it's after I retired that I heard about that.

2    Q.      Okay. Did -- were you aware -- that lead was a problem in Mt. Lake
before you retired?

3    [Objections]

4    THE WITNESS: . . . . The one thing about lead that I remember was that
there was a concern that a swan had died, and there was, as I think I mentioned
5    earlier, there was speculation that the swan had swallowed a sinker. … That's the
first memory I have of lead.

6    Q.      Okay.

7    THE WITNESS:  As to any kind of generalized lead pollution, I never heard
of that.

8    BY MR. MILLER:

9    Q.      Okay. So you were never aware that there may have been lead in the
sediments in Mt. Lake?

A.      That -- was not aware of that.

10

11   USA-107 at 49:24 – 51:10.  In sum, not only did the GGNPA not know of a Pollution Event

12   at Mt. Lake, its knowledge cannot be imputed to the Trust.

13          **D.      Zurich's Construction of Endorsement 3 to the REEL Policy Is Not
                   Reasonable Because It Disregards The Language of the Endorsement, Makes**
14                 **Coverage Dependent on Establishing The Absence of a Constituent In Any
                   Level, No Matter How Minute, In Exhibit 2 to the MOA, and It Contradicts**
15                 **Zurich's November 2006 Letter to the Trust.**

16          Not once in its motion does Zurich cite Endorsement 3 in its entirety, omitting subpart (2),

17   which states:  "any Pollution Event identified in Exhibit 2 to the MOA but not included in the

18   attached Table 1 to this endorsement is not known to the Insureds for the purpose of this Policy."

19   Endorsement No. 3 effectively modifies Exclusion A by establishing, for purposes of the REEL

20   Policy, what Pollution Events the parties agreed were known and which Pollution Events were not

21   known, regardless of which Pollution Events actually were known.  Zurich has the burden of

22   establishing that Endorsement No. 3 precludes coverage under the REEL Policy for the Trust's Mt.

23   Lake claim.  Zurich has not and cannot meet its burden.

24          Endorsement No. 3 generally provides that Pollution Events identified in Exhibit 2 to the

25

26   MOA that are known to the Trust are included in Table 1 to the endorsement and excluded from

27   coverage pursuant to Exclusion A; Pollution Events identified in Exhibit 2 to the MOA but not

28

19

included in Table 1 are not known to the Trust for purposes of the REEL Policy. In order to meet its burden, Zurich would have to prove that an actionable release of lead occurred into Mt. Lake, that this release is identified in Exhibit 2 to the MOA, and that the release is included in Table 1. In fact, nothing in Table 1 suggests that cleanup of sediment is required (i.e., that an actionable release of lead occurred). Table 1 only suggests the need to monitor surface water to determine if biological verification sampling was necessary. Because Table 1 does not include the Pollution Event at issue here, it was not known to the Trust for purposes of the REEL Policy.

Zurich's construction of Endorsement 3 leads to absurd results. If there is any mention of the chemical or metal of interest, anywhere in any document listed on Exhibit 2, then the Trust is deemed to have known about that detection and coverage is defeated by Exclusion A. There is no coverage, under Zurich's theory, unless the Trust proves the complete absence of any reference in Exhibit 2 to the metal at issue. If that is how the parties intended Endorsement 3 to work, there was no reason for them to agree to a schedule of activities in the RSL. Finally, as noted elsewhere, Zurich's theory contradicts its letter to the Trust in November 2006. USA-65.

By contrast, the Trust's interpretation of Endorsement 3 is reasonable. According to the language of the Endorsement, any pollution event not included in the attached table is not known. When a new activity becomes necessary at a site on the RSL's SOW, it is a REEL claim. USA-106 (Bloom Depo. 63-88 ("known" was a "term of art") *see also* 46-53, 101-119, 125-134, 140-45, 210-17), USA-108 (Cooper Depo. 49-57, 85-90, 166-171, 178-83). The SOW table contains activities at the listed sites. Some of the activities are for active remediation. In the case of Mt. Lake and Building 937, the activities are testing and monitoring, not active remediation. Because there was no remediation planned at either site as of the time the policies were formed, there was no pollution event identified in the table attached to the endorsement.

///

20

**E.      Zurich's Position Regarding RSL Coverage for Mt. Lake and Building 937 Contradicts Its Position In Other Correspondence That RSL Coverage Is Limited to the Schedule of Activities in The SOW and Allows Zurich to Nullify The Existence of the REEL Policy When It Chooses.**

Zurich now claims there is RSL Coverage for Mt. Lake.  Before the litigation, Zurich would not confirm this position, but it "affirmed" RSL coverage for Building 937 in writing.  According to Zurich's newly minted position on Mt. Lake, the RSL's SOW at inception included any and all work at Mt. Lake that could ever be required by DTSC.  The starting point for this analysis is Zurich's argument that there can never be coverage for Mt. Lake under the REEL if there is coverage under the RSL.

First, Zurich incorrectly argues the policies are mutually exclusive in their scope of coverage.  In discovery, Zurich produced internal e-mails in which its underwriters discussed a site called Barnard Avenue Firing Range. USA-99.  They concluded that it could be added to either the REEL or the RSL Policy and discussed their preference for adding it to the RSL.  They proposed adding it to the RSL, and the Trust agreed.  At no time did Zurich's underwriters tell the Trust there was an option to pick between the policies for coverage.  In addition, at LAIR, Zurich agreed to cover a portion of the costs associated with the soil excavation under the RSL and the disposal of the soil under the REEL.  Both policies covered portions of one body of work at the site, which was completed before Zurich added the endorsement in 2003.  USA-51 (4/11/06 memo confirming all work done at site in 2002), USA-110 at 3.

Second, Zurich's RSL coverage argument conflates the policy terms used in the REEL and RSL.  The RSL does not use the term Pollution Event.  It provides coverage for cost overruns for the scheduled activities at the sites listed in the SOW.  After reviewing Exhibit 2 to the MOA, Zurich confirmed it would still underwrite the RSL by using a SOW.  USA-13 at 2 ("The RSL will still be underwritten to scopes of work.").  Now, Zurich wants an RSL that pays cost overruns for any and all work at a site.  This position is inconsistent with Zurich's scope of work letters (USA-

82-96) and reasons for hiring Mr. Catts (USA-97; Lee ¶100).  Zurich's inconsistent use of "Pollution Event" should not be permitted.

Third, Zurich's claim about the flexibility the Trust sought in the SOW is inaccurate.  The flexibility requested was to have coverage for costs associated with and necessary to complete the scheduled activities, not a new activity subsequently proposed. USA-108 at 126:16-134:19.  As a matter of common sense, digging up the sediment at Mt. Lake is not associated with and necessary to complete water sampling at that site.

Fourth, as a practical matter, if Zurich's position were correct, there would be no limit to the flexibility of the SOW and no need for a REEL policy.  Zurich's position about the SOW at inception also begs the question of why, if the SOW was intended to include all work at Mt. Lake and the other listed sites from the outset, did Zurich endorse the RSL with numerous SOW modifications, including Endorsement 10?  Under Zurich's theory, Endorsement 10 is surplusage.

Fifth, Zurich's argument that Endorsement 10 establishes RSL coverage for Mt. Lake belies the evidence.  In December 2002, the Trust informed Zurich it was agreeing to the endorsement without prejudice to its claim for REEL coverage at Mt. Lake.  In subsequent correspondence, Zurich acknowledged that the reporting of Mt. Lake costs under the RSL did not affect the Trust's claim for REEL coverage at the site. USA-45 at 2 ("no impact" on litigation positions).  Zurich's claims handler confirmed this at deposition. USA-110 at 205:1-211:17 ("I recognize and respect the trust's position regarding coverage for Mt. Lake.").

Drawing all inferences in favor of the plaintiff, the motion should be denied because a reasonable jury could determine that Mt. Lake is covered under the REEL Policy.

### F.   Zurich's Long Overdue Concession of RSL Coverage for Mt. Lake Is Evidence of Its Breach of the Policies, and Does Not Preclude USA's Claim for REEL Coverage and Bad Faith Claim.

In this motion, at long last, Zurich confirms there is coverage under the RSL policy for Mt. Lake.  Previously, Zurich held the position that the Trust had not shown it had any requirement to

22

clean up the site.  *See, e.g.*, USA-40-44; Docket #17 at ¶14; USA-120 (RFA#5), 121 (RFA#2), 122 (RFA#2).  At the same time, Zurich also told the Trust there could be no REEL coverage at Mt. Lake for the opposite reason, namely that under the RSL policy the work was already included in the SOW, including any expansion of the SOW required by DTSC.  USA-40-44.  It is this evidence of whipsawing of the Trust by Zurich that should be heard by a jury.  Zurich should have assured the Trust of RSL coverage when it reached that conclusion in 2002.  During the policy negotiations, Zurich told the Trust the policies "dovetailed" to provide comprehensive coverage. USA-13 at 2, ¶3.  But during the past several years, Zurich maintained a coverage position, using internally inconsistent arguments about governmental authority, to keep alive the possibility that there would be no coverage under either policy.  Not only was this inconsistent with the language of the policies and the pre-policy representations by Zurich, it was inconsistent with Zurich's internal documents that only came to light because of this litigation.

In its internal background memo from 1999, Zurich acknowledged the obvious:  that the Consent Agreement with the DTSC obligated the Trust to clean up Mt. Lake and the rest of the Presidio.  John Catts' memos from 2001-2002 document that Zurich's determination that Mt. Lake was covered under the RSL.  In claims notes made by Zurich's adjusters in 2002 and later, they documented Zurich's determination that Mt. Lake was covered under the RSL.  In letters from 2006-2008, Zurich maintained its conditional position to the Trust.  By keeping its coverage determination secret and maintaining a possible condition for denying coverage belied by its internal documentation, Zurich acted unreasonably.

The jury should be permitted to hear the evidence explaining Zurich's misconduct.  Zurich "affirmed" RSL coverage for Bldg. 937 (while concealing its REEL coverage determination for that claim) but refused to "affirm" for Mt. Lake.  Zurich claimed the RSL SOW included sediment cleanup at Mt. Lake at inception, while keeping its internal documents to the contrary hidden from

the Trust.  Zurich delayed in making REEL payments on LAIR by over 2 years, which ironically contradicted how it said the policies would operate at LAIR in the case study it presented in October 1998. USA-9 at 28-29.  Zurich used differing Pollution Event criteria to deny Mt. Lake (any lead =  Pollution Event), deny Merchant Road (not enough arsenic to be Pollution Event), and to accept LAIR and Richardson Slip.  In early 2006, Zurich identified the handful of sites that could lead to an exposure of more than $5 million, including Mt. Lake and Baker Beach 2A. USA-103. By early 2007, Zurich had ample internal documentation of the scope of exposure it faced under these two claims, either one of which would render the REEL policy unprofitable for Zurich. USA-104, 105.  In 2007, Zurich accepted coverage under the REEL for Baker Beach 2A, anticipated paying out nearly $4 million, but dragged its feet to make delayed and incomplete payments. Zurich still owes over $2.3 million on this site in delayed payment of covered losses.  Its re-writing of the REEL's Subrogation provisions to permit it to deduct the $2.3 million before the end of remediation at Baker Beach 2A is an unreasonable change of policy interpretation.  USA-53 (Richardson Slip Ramp, Trust's Oct. 2008 subrogation payment to Zurich was two years after Zurich paid REEL claim).

## V.    CONCLUSION

For these reasons, and because it is bad public policy to permit Zurich to use inconsistent policy interpretations to suit its interests ahead of its insured's, the motion should be denied.


Dated: November 19, 2010

MELINDA HAAG
United States Attorney


By:____/s/_____
JONATHAN U. LEE
Assistant U.S. Attorneys
COUNSEL FOR PLAINTIFF USA and
COUNTER DEFENDANT PRESIDIO
TRUST

24